**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 3, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CAROLINA CASUALTY
INSURANCE COMPANY,

      Plaintiffs-Appellants,

    v.

TYMER YEATES and SHARI
YEATES,

      Defendants-Appellees.


UNITED STATES OF AMERICA,

      Amicus Curiae.

No.  07-4019

---

**EN BANC REHEARING ON APPEAL**
**FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 1:05-CV-124-PGC)**

---

R. Clay Porter, Dennis, Corry, Porter & Smith, L.L.P., Atlanta, Georgia (Beth R. Holck, Dennis, Corry, Porter & Smith, L.L.P., Atlanta, Georgia; Heinz J.  Mahler and Stephen D. Kelson, Kipp and Christian, P.C., Salt Lake City, Utah, with him on the briefs), for Appellant.

Jesse C. Trentadue, Suitter Axland, PLLC, Salt Lake City, Utah, for Appellees.

H. Thomas Byron III, Appellate Staff Attorney, United States Department of Justice, Civil Division, Washington, District of Columbia (Michael F. Hertz, Acting Assistant Attorney General, Brett L. Tolman, United States Attorney, and Scott R. McIntosh, Appellate Staff Attorney, United States Department of Justice, Civil Division, Washington, District of Columbia; Rosalind A. Knapp, Acting

General Counsel, Paul M. Geier, Assistant General Counsel, David K. Tochen, Acting Chief Counsel, Debra S. Straus, Attorney, Federal Motor Carrier Safety Administration, United States Department of Transportation, Washington, District of Columbia, with him on the brief) for Amicus Curiae.

---

Before **HENRY,** Chief Judge, **TACHA**, **KELLY**, **BRISCOE**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, **McCONNELL**,[*] **TYMKOVICH**, **GORSUCH**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

We granted en banc rehearing to reconsider our precedent concerning the scope and application of federally mandated insurance for interstate commercial motor carriers. *See Carolina Cas. Ins. Co. v. Yeates*, 533 F.3d 1202 (10th Cir. 2008) (applying *Empire Fire & Marine Ins. Co. v. Guar. Nat'l Ins. Co.*, 868 F.2d 357 (10th Cir. 1989)).

Federal regulations require interstate trucking companies to maintain insurance or another form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles." 49 C.F.R. § 387.301(a); *see also id.* § 387.7. To satisfy this insurance

---

[*] The Honorable Michael W. McConnell, originally a member of this panel, resigned his commission effective August 31, 2009. The remaining members of the panel, who are in agreement, have determined this matter. *See* 28 U.S.C. § 46(d).

requirement, most interstate trucking companies obtain a specific endorsement to one or more of their insurance policies—the MCS-90 endorsement—which guarantees payment of minimum amounts, as set forth in the regulations, to an injured member of the public. *Id.* §§ 387.7, 387.9. An MCS-90 endorsement is intended to "eliminate[] the possibility of a denial of coverage by requiring the insurer to pay any final judgment recovered against the insured for negligence in the operation, maintenance, or use of motor vehicles subject to federal financial responsibility requirements, even though the accident vehicle is not listed in the policy." 1 Auto. Liability Ins. 4th § 2:12 (2008).

In this circuit, the leading case interpreting the MCS-90 endorsement is *Empire Fire*. In *Empire Fire*, we evaluated the effect of an MCS-90 endorsement where multiple insurance policies covered an accident between a trucker and a member of the public. In resolving which of the policies provided primary coverage, we concluded the MCS-90 endorsement amended contrary language in the underlying insurance policy, which would otherwise have limited the insurance carrier's liability to excess coverage. *Empire Fire*, 868 F.2d at 363. Because multiple potential sources of liability coverage existed, we held that liability for primary coverage should be allocated among the insurers "pursuant to traditional state insurance and contract law principles." *Id.* at 368. This holding has been interpreted to mean that an MCS-90 endorsement modifies the underlying insurance policy in a variety of ways, including (1) allowing recovery

from a policy that otherwise does not provide liability coverage, and (2) allowing primary liability recovery from a policy that provides only excess coverage.

*Empire Fire* carefully addressed competing views in the then-existing precedent regarding the scope of the MCS-90 endorsement, but its rule has placed this circuit in the minority for quite some time. *See generally* Appleman on Insurance Supp. to § 4467 (Supp. 2008) (describing split). In fact, since our holding in *Empire Fire*, only one other circuit has apparently followed our lead. *See Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340 (6th Cir. 1996); *but see Kline v. Gulf Ins. Co.*, 466 F.3d 450 (6th Cir. 2006) (declining to read an MCS-90 endorsement as modifying the underlying insurance policy limitations).

In this en banc proceeding, Carolina Casualty argues our 20-year-old decision in *Empire Fire* has evolved into an idiosyncratic, minority position that frustrates the regulatory purpose behind the MCS-90 endorsement and impedes the uniform regulation of interstate trucking. Carolina Casualty asks us to revisit our prior reasoning and join the majority of circuits in recognizing the MCS-90 endorsement as a surety obligation. We take that opportunity here.

For the reasons discussed below, we hold the MCS-90 endorsement only applies where: (1) the underlying insurance policy to which the endorsement is attached does not provide coverage for the motor carrier's accident, *and* (2) the motor carrier's insurance coverage is either not sufficient to satisfy the federally-prescribed minimum levels of financial responsibility or is non-existent.

We therefore VACATE the panel's opinion, REVERSE the district court's judgment, and order the district court to enter judgment consistent with this opinion.

## I. Background

In 2003 Tymer Yeates was severely injured when a car his wife was driving was involved in a head-on collision with a truck owned by Bingham Livestock. Yeates and his wife sued Bingham Livestock and the truck driver in state court. Bingham Livestock carried two insurance policies relevant to this accident, one issued by State Farm and one issued by Carolina Casualty. Bingham Livestock notified both carriers of the claim.

State Farm's policy specifically insured the truck involved in the accident. Without much delay, it tendered the policy limit of $750,000 to the Yeateses. In contrast, Carolina Casualty's policy was a general liability policy covering a variety of commercial claims, but did not extend to the truck involved in the accident. It did, however, include an MCS-90 endorsement, which provided that Carolina Casualty would pay up to $1,000,000 for "any final judgment recovered against [Bingham Livestock] for public liability resulting from negligence in the operation, maintenance or use of motor vehicles." R., App. at 79 (MCS-90 endorsement).

While the Yeateses' negligence case was pending in Utah state court, Carolina Casualty filed this declaratory judgment action in federal court.

Carolina Casualty sought a ruling that it had no liability to the Yeateses under the general liability policy because (1) State Farm had already tendered its $750,000 policy limits; (2) federal regulations require a minimum of $750,000 for such accident claims; and (3) therefore, the MCS-90 endorsement would not be needed to provide federally mandated minimum coverage. The district court rejected this argument on the basis of our holding in *Empire Fire*, concluding the Carolina Casualty policy also provides primary insurance for the accident under the endorsement and thus Carolina Casualty may be required to pay any final judgment resulting from the Yeateses' accident.

Carolina Casualty appealed, arguing one central point. Since State Farm's policy specifically covered the accident at issue (and State Farm had already paid out its policy limits) and Carolina Casualty's general liability policy did not cover Bingham Livestock's truck, the MCS-90 endorsement was not triggered. More specifically, Carolina Casualty contended (1) its endorsement operated as a "surety" to make it an insurer of last resort, requiring payment only when no other insurance is available; (2) the MCS-90 endorsement attached to its policy was therefore not triggered because the Yeateses had already received insurance benefits at least equal to the minimum amount required by the MCS-90 endorsement; and, accordingly (3) our precedent in *Empire Fire* was flawed under the reasoning adopted by the large majority of other circuit courts in the years

since it was decided. A panel of this Court affirmed, finding our prior decision in *Empire Fire* binding.

The panel determined "Carolina Casualty's policy as amended by the endorsement may be available to cover a final judgment arising from the accident." *Carolina Cas.*, 533 F.3d at 1206. Applying *Empire Fire*, the panel reasoned that "two conditions must be satisfied before the [MCS-90] endorsement will operate to amend the underlying policy: (1) there must be a covered accident, and (2) the underlying policy must preclude coverage for that accident." *Id.* Because Carolina Casualty's policy precluded coverage for the truck involved in the accident, the panel concluded the attached "MCS-90 endorsement operate[d] to 'amend' the underlying policy and guarantee[d] payment 'regardless' of limiting provisions in the underlying policy." *Id.* On this basis, the panel affirmed the district court's grant of summary judgment in the Yeateses' favor.

Carolina Casualty then sought a rehearing en banc, contending—as it has throughout this litigation—that our decision in *Empire Fire* is out of step with the other circuits. We granted Carolina Casualty's rehearing request and asked for supplemental briefing on whether our rule from *Empire Fire*, that an MCS-90 endorsement negates limiting provisions in the attached policy to render that

-7-

policy a primary source of insurance coverage, should be reaffirmed, overruled, or modified.[1]

Today, we modify our prior holding in *Empire Fire* and adopt the rule used by the majority of our sister circuits.

## II.  Regulatory and Legal Framework

We begin with an explanation of the MCS-90 endorsement and its associated regulations.  We then address the competing legal analyses of the endorsement, including our approach in *Empire Fire*.  Finally, with this background in mind, we adopt the majority approach and apply it to the facts of this case.

### A.  MCS-90 Endorsement

As part of its push to deregulate the trucking industry, increase competition, reduce entry barriers, and improve quality of service, Congress passed the Motor Carrier Act of 1980 (MCA), 49 U.S.C. § 10101 *et seq.  See* H.R. Rep. No. 96-1069 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2283; *see also* Deimling, Gregory G. et al., The MCS-90 Book: Truckers Versus Insurers and the Government Makes Three 13 (2004).  According to the House Report accompanying the MCA, the "intent of this legislation [was] to overhaul

---

[1]  Due to the governmental interests involved, we also invited the United States to submit an amicus brief on this issue.  Additionally, the Trucking Industry Defense Association filed a supplemental amicus brief in support of Carolina Casualty.

outmoded and archaic regulatory mechanisms, while retaining the pluses of an industry that has worked by simply conducting itself under the 'rules of the game.'" H.R. Rep. No. 96-1069, at 2.

Nevertheless, while the legislation was aimed at reducing regulatory barriers in the interstate motor carrier industry, some legislators "fear[ed] that increased safety problems [would] result from the expanded entry provided in [the MCA]" and that "increased entry [would] open the highways to truckers who might have little concern for the safe operation and maintenance of their vehicles, thereby posing a threat to those who share the highways with them." *Id.* at 6. The MCA, therefore, included provisions addressing these concerns as well as the "abuses that had arisen in the interstate trucking industry which threatened public safety, including the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce." *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 489 (4th Cir. 2003); *Empire Fire*, 868 F.2d at 362;[2] *see also* 16 Couch

---

[2] In *Empire Fire*, we recognized:

> In the past, the use by truckers of leased or borrowed vehicles led to a number of abuses that threatened the public interest and the economic stability of the trucking industry. In some cases, ICC-licensed carriers used leased or interchanged vehicles to avoid safety regulations governing equipment and drivers. In other cases, the use of non-owned vehicles led to public confusion as to who was financially responsible for accidents caused by those vehicles.

(continued...)

on Insurance § 226:10 (3d ed. 2008) ("The relationships in the trucking business are often complicated and usually involve multiple policies. For example, one entity can own the tractor while another entity owns the trailer, with both of these entities having contractual arrangements with another party, the trucking company.").

The MCA and the subsequent regulations promulgated by the Federal Motor Carrier Safety Administration (FMCSA)[3] require interstate motor carriers to obtain "a special endorsement . . . providing that the insurer will pay within policy limits any judgment recovered against the insured motor carrier for liability resulting from the carrier's negligence, whether or not the vehicle involved in the accident is specifically described in the policy." *Ill. Cent. R.R. v. DuPont*, 326 F.3d 665, 666 (5th Cir. 2003). In particular, the MCA provides that

---

[2](...continued)
    In order to address these abuses, Congress amended the Interstate Commerce Act to allow the ICC to prescribe regulations to insure that motor carriers would be fully responsible for the operation of vehicles certified to them. . . . In response to this mandate, the . . . ICC requires that all ICC-certified carriers maintain insurance or other form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles" under the carrier's permit.

868 F.2d at 362 (citations omitted); *see* H.R. Rep. No. 96-1069, at 6; *see also* 49 U.S.C. §§ 13902, 13906.

[3] The FMCSA is currently responsible for administrating the regulations. It was previously part of the now-defunct Interstate Commerce Commission's purview.

-10-

a commercial motor carrier may operate only if registered to do so, 49 U.S.C. § 13901, and must be "willing and able to comply with . . . [certain] *minimum financial responsibility requirements*,"[4] *id.* § 13902(a)(1) (emphasis added).

The regulations promulgated pursuant to the MCA require proof of financial responsibility by one of three methods:

> (1) "Endorsement(s) for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980" (Form MCS-90) issued by an insurer(s);

> (2) A "Motor Carrier Surety Bond for Public Liability under Section 30 of the Motor Carrier Act of 1980" (Form MCS-82) issued by a surety; or

> (3) A written decision, order, or authorization of the Federal Motor Carrier Safety Administration authorizing a motor carrier to self-insure under § 387.309, provided the motor carrier maintains a satisfactory safety rating as determined by the Federal Motor Carrier Safety Administration . . . .

49 C.F.R. § 387.7(d)(1)–(3). In other words, a motor carrier can establish proof of the requisite financial responsibility in one of three ways—(1) by an MCS-90 endorsement, (2) by a surety bond, or (3) by self-insurance. *See Distrib. Servs., Inc.*, 320 F.3d at 489.

---

[4] A motor carrier transporting property must demonstrate financial responsibility of "at least $750,000.00." 49 U.S.C. § 31139(b)(2). The implementing regulations "prescribe[] the minimum levels of financial responsibility required to be maintained by motor carriers of property operating motor vehicles in interstate, foreign, or intrastate commerce," 49 C.F.R. § 387.1, and "appl[y] to for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce," *id.* § 387.3. Specific minimum levels are defined by the cargo being transported. *Id.* § 387.9.

The regulations also denote the specific forms necessary to establish compliance with the financial responsibility requirements. Specifically, the MCS-90 form is set forth in 49 C.F.R. § 387.15.[5]

---

[5] Section 387.15 mandates the following relevant provisions in an MCS-90 endorsement:

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration.

In consideration of the premiums stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. . . . It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

(continued...)

*B. Interplay of the MCS-90 Endorsement and Liability Insurance*

The language of the MCS-90 endorsement and the underlying regulations evince several key conclusions with respect to the financial responsibility requirements.[6] First, the financial responsibility provisions require motor carriers to demonstrate they are adequately insured in order to protect the public from risks created by the carriers' operations. *See id.* §§ 387.1, 387.7. From the express language of the Motor Carrier Act and the regulations, these provisions are intended to impose a mandatory requirement that motor carriers obtain a minimum level of liability insurance, depending on the cargo they carry. *See id.* § 387.9.

Second, the provisions were designed to ensure the *collectability* of a judgment—not to relieve the injured member of the public from the requirement that he or she obtain a final judgment of legal liability against the motor carrier and its insurers as a prerequisite. *See id.* § 387.15, Illus. I ("[T]he insurer . . . agrees to pay, within the limits of liability described herein, *any final judgment* recovered against the insured for public liability resulting from negligence . . . ." (emphasis added)).

---

[5](...continued)
49 C.F.R. § 387.15, Illus. I.

[6] The regulations define "financial responsibility" as: "the financial reserves (e.g., insurance policies or surety bonds) sufficient to satisfy liability amounts set forth . . . covering public liability." 49 C.F.R. § 387.5.

Third, an MCS-90 endorsement—as one of the acceptable methods of demonstrating financial responsibility—is ambiguous with respect to how it interacts with the underlying insurance policy. The endorsement states that "no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the [insurance company] from liability or from the payment of any final judgment, within the limits of liability herein described." *Id.* On one hand, this provision may suggest the endorsement modifies the underlying policy to the extent the policy is inconsistent. But on the other hand, the endorsement further provides that "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company." *Id.* It is precisely this ambiguity that has created the confusion about the effect of an MCS-90 endorsement on an injured party's right to recover a negligence judgment against a motor carrier.

The tension between these competing clauses in the MCS-90 endorsement leads to confusion because courts are typically confronted with two determinations involving the endorsement that must be resolved contemporaneously: (1) the proper allocation of insurance liability among multiple insurers and the motor carrier, and (2) any possible public financial responsibility because of a shortfall in available sources for satisfaction of a

-14-

judgment against the motor carrier, at least up to the prescribed minimum amount under the regulations.

When we decided *Empire Fire* over 20 years ago, the MCS-90 landscape was sparse. Since then, our reasoning in *Empire Fire* has been relegated to a minority position. *See* Appleman on Insurance Supp. to § 4467 (Supp. 2008) (describing the circuit split and the various approaches). To better explain our decision today, we provide a brief summary of the competing approaches to the interpretation and application of the MCS-90 endorsement.

*C.* Empire Fire *& Approaches in Other Circuits*

      1. *Empire Fire & Marine Insurance Co. v. Guaranty National Insurance Co.*, 868 F.2d 357 (10th Cir. 1989)

In *Empire Fire*, we resolved the conflict created when multiple insurance carriers with MCS-90 endorsements provided coverage for a trucker's accident. There, the dispute involved two insurance companies, Guaranty Insurance Company and Empire Fire Insurance Company, and concerned their respective insurance-policy-based responsibilities for a motor carrier's accident involving a truck and driver it had leased from another company. *Empire Fire*, 868 F.2d at 357. Notably, both insurance policies provided coverage for the accident at issue, and the dispute centered on which insurer was responsible for primary coverage—i.e., who would pay first. *Id.* at 359.

The Guaranty Insurance policy, issued to the motor carrier, contained a clause limiting liability to excess coverage for accidents involving vehicles not owned by the carrier. *Id.* at 360. The leasing company, which owned the truck and had leased the vehicle and the driver to the motor carrier, was insured under the Empire Fire policy. *Id.* at 359. By its own terms the Empire Fire policy provided primary coverage. *Id.* at 360. Only the Guaranty Insurance policy, however, contained an MCS-90 endorsement. *Id.* at 360–61. Based on the MCS-90 endorsement, the district court concluded Guaranty Insurance was "the primary insurer as a matter of law over any other insurer." *Empire Fire*, 868 F.2d at 359.

We reversed, finding the MCS-90 endorsement made Guaranty Insurance's coverage co-primary—i.e., Guaranty was *a* primary insurer, but not necessarily the only primary insurer. *Id.* at 361. In reaching this conclusion, we considered three competing interpretations of the scope of the MCS-90 endorsement:

> (1) The . . . endorsement makes the insurance policy to which it is attached primary as a matter of law over all other insurance policies that lack similar provisions.
>
> (2) [T]he endorsement only negates limiting provisions in the policy to which it is attached, such as an "excess coverage" clause, but does not establish primary liability over other policies that are also primary by their own terms.
>
> (3) [T]he endorsement applies only to situations in which a claim is being asserted by a shipper or a member of the public, and that the endorsement does not apply when allocating liability among insurance carriers.

-16-

*Id.*[7]

We adopted the second approach, determining that both Guaranty Insurance's policy and Empire Fire's policy were available to cover a liability judgment arising from the accident. *Id.* at 365. We did not, however, decide how the liability would be distributed between the two insurance policies. *Id.* at 366. Instead, we determined that "once limiting language is read out . . . the two policies then must be compared pursuant to traditional state insurance and contract law principles to determine how liability should be allocated" among the insurers. *Id.* at 368. We have applied the *Empire Fire* reasoning in several later cases. *See Campbell v. Bartlett*, 975 F.2d 1569, 1581 (10th Cir. 1992); *Budd v. Am. Excess Ins. Co.*, 928 F.2d 344, 347 (10th Cir. 1991); *Railhead Freight Sys. v. U.S. Fire Ins. Co.*, 924 F.2d 994, 995 (10th Cir. 1991).

More recently, in *Adams v. Royal Indemnity Co.*, we addressed circumstances where no insurance policy, solely by its terms, extended to provide liability insurance coverage for a motor carrier's negligence. 99 F.3d 964 (10th Cir. 1996). The injured party, Adams, was unsuccessful in collecting a judgment

---

[7] Only the Second Circuit has appeared to follow the first approach, holding that an MCS-90 endorsement, irrespective of the terms of the underlying insurance policy, makes that policy primary as a matter of law with respect to coverage for a motor carrier's negligence. *Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc.*, 930 F.2d 258 (2d Cir. 1991); *see also* Harold A. Weston, Annotation, *Effect of Motor Carrier Act Provisions on Insurance and Indemnity Agreements (49 U.S.C.A. §§ 13906, 14102) in Allocating Losses Involving Interstate Motor Carriers*, 157 A.L.R. Fed. 549, § 9 (1999).

of approximately $1 million against the driver. *Id.* at 965. He then sued Royal Indemnity, which had issued two insurance policies: one to the lessee of the trailer involved in the accident and one to the partnership that owned the trailer. *Id.* Both policies contained MCS-90 endorsements. *Id.*

We concluded that although neither policy provided insurance coverage for the accident, the lessee's policy—by operation of the MCS-90 endorsement—extended to make Royal liable for Adams's unsatisfied judgment. *Id.* at 970–71. Several insights regarding the MCS-90's purpose and operation were key to this conclusion.

First, we noted that the "ICC endorsement is designed to require ICC-certified carriers to insure against public liability for all their motor vehicles" and that "[b]y requiring . . . this ICC endorsement, the ICC prevents the possibility that, through inadvertence or otherwise, some vehicles may be left off a policy to the detriment of the public." *Id.* at 968.

Second, while the MCS-90 endorsement does not explicitly define "insured," we concluded it indirectly modified the lessee's policy with Royal so the term extended to the trailer and driver involved in Adams's accident. *Adams*, 99 F.3d at 970.

Finally, we acknowledged the "endorsement is not intended to preclude insurers and carriers or multiple insurers from contractually apportioning ultimate liability among themselves," *id.* at 969, and most importantly, "[i]n situations

-18-

where the policy absent the endorsement did not insure the vehicle which caused the injuries, the endorsement explicitly requires that the insured reimburse the insurer because the insurer's payment to the injured motorist is a 'payment the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement,'" *id.* at 972 (quoting the mandatory language of the endorsement).  Thus, we concluded "the public is protected by insurance and *ultimate responsibility rests on the truckers*, all as mandated by Congress and the [FMCSA]." *Id.* (emphasis added).  As noted below, our *Adams* approach is in accord with the majority view.

But, our analysis under *Empire Fire*—which, as discussed above, involved a slightly different factual scenario—has fallen into disfavor.  Specifically, other courts have disagreed with our conclusion in *Empire Fire* that if an insurance policy with an attached MCS-90 endorsement provides coverage for a motor carrier's accident, the MCS-90 endorsement operates to read out any limiting provisions to make such an insurer a primary insurer, although not necessarily the only one.  Under this approach, an insurer may be forced to indemnify the motor carrier for its negligence to a greater extent than it bargained for and without a right to reimbursement from another primary insurer.

## 2.  Majority Approach

The majority of circuits approach the MCS-90 endorsement using a different framework from *Empire Fire*.  We find their framework persuasive.

First, the cases describe the insurer's obligation under the MCS-90 endorsement as one of a surety rather than a modification of the underlying policy.[8]  The endorsement is a safety net in the event other insurance is lacking. *See Canal Ins. Co. v. Carolina Cas. Ins. Co.*, 59 F.3d 281, 283 (1st Cir. 1995) (holding the endorsement to be a "suretyship by the insurance carrier to protect the public—a safety net—but not insurance relieving . . . [another] insurer.  On the contrary, it simply covers the public when other coverage is lacking"); *see also Kline v. Gulf Ins. Co.*, 466 F.3d 450, 455–56 (6th Cir. 2006) (same); *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 442 n.4 (3rd Cir. 2006) (same); *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 490 (4th Cir. 2003) (same); *T.H.E. Ins. Co. v. Larsen Intermodal Servs., Inc.*, 242 F.3d 667, 672 (5th Cir. 2001) (same); *Harco Nat'l Ins. Co. v. Bobac Trucking Inc.*, 107 F.3d 733, 736 (9th Cir. 1997); *Occidental Fire & Cas. Co. of N.C. v. Int'l Ins. Co.*, 804 F.2d 983, 986 (7th Cir. 1986).  Under this reasoning, an MCS-90 insurer's duty to pay a judgment arises not from any insurance obligation, but from the endorsement's

---

[8]  A surety is "a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default or miscarriage of another, the principal."  74 Am. Jur. 2d Suretyship § 1 (1974); *see Carolina Cas.*, 533 F.3d at 1208.  Accordingly, the MCS-90 insurer would be a surety for the motor carrier, the principal.  Under the surety framework, the MCS-90 endorsement would obligate the insurer to be answerable for a public liability judgment—up to certain amounts—against the motor carrier.  Unlike our *Empire Fire* approach, the surety obligation does not alter the underlying insurance policy and does not preclude the insurer from seeking reimbursement for its surety-based payments on behalf of the motor carrier.

language *guaranteeing* a source of recovery in the event the motor carrier negligently injures a member of the public on the highways.

Second, in marked contrast to our approach in *Empire Fire*, these cases describe the surety obligation—to pay a negligence judgment against a motor carrier under the MCS-90 endorsement—as one that is triggered only when (1) the underlying insurance policy to which the endorsement is attached does not otherwise provide coverage, *and* (2) either no other insurer is available to satisfy the judgment against the motor carrier, or the motor carrier's insurance coverage is insufficient to satisfy the federally-prescribed minimum levels of financial responsibility. *E.g.*, *Kline*, 466 F.3d at 455–56; *Underwriters at Lloyd's London*, 435 F.3d at 442 n.4; *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 470 (5th Cir. 2005).

Third, according to the majority case law, the MCS-90 endorsement, its terms, and its operating provisions that supercede any limitation in the underlying insurance policy are only implicated as between an injured member of the public and the MCS-90 insurer. *E.g.*, *Distrib. Servs., Inc.*, 320 F.3d at 493. Referencing the express language of the MCS-90 endorsement—which provides that "all terms, conditions, and limitations in the policy to which the [MCS-90] endorsement is attached shall remain in full force and effect as binding between the insured and the company,"—these cases conclude the MCS-90 endorsement operates only to protect the public and "does not alter the relationship between

the insured and the insurer as otherwise provided in the policy." *Id.* Further, "the

MCS-90 endorsement cannot reasonably be read to alter the terms of the policy

for the benefit of other insurers." *Id.* The endorsement, in other words, is

irrelevant to and has no effect on the ultimate allocation of a judgment against a

motor carrier as between the carrier and its various insurers.[9]

Finally, under the majority's approach—just as we held in *Adams*—the

MCS-90 endorsement operates only to guarantee a source of payment of a

judgment, and does not relieve the motor carrier or its liability insurers (assuming

the respective insurance policies extend to the accident at issue) of their duty to

satisfy an injured party's judgment against the carrier. "The peculiar nature of

the MCS-90 endorsement grants the judgment creditor the right to demand

payment directly from the insurer, and simultaneously grants the insurer the right

---

[9] Although facially similar, the majority approach differs slightly from *Empire Fire*. *Empire Fire* stated that while the MCS-90 endorsement does not govern the ultimate allocation of liability as among a motor carrier's various insurers, *Empire Fire*, 868 F.2d at 366, it does read out any inconsistent limiting language in the underlying policy, *id.* at 368. Therefore, under *Empire Fire,* an insurer may be required to provide liability insurance coverage for a motor carrier its policy would have otherwise excluded but for the MCS-90's reading out limiting clauses that, for example, constrain the definition of an insured vehicle or driver.

Under the majority view, the MCS-90 is completely irrelevant to the allocation of liability insurance coverage for a motor carrier's negligence. Rather, liability is entirely governed by the express terms of the respective insurance policies, including any limiting provisions—i.e., terms which exclude vehicles or drivers covered by the policy, limit the policy to primary or excess coverage, and the like. In this respect, our holding in *Adams*, 99 F.3d 964, was completely consistent with the majority view.

to demand reimbursement from the insured." *Underwriters at Lloyd's London*, 435 F.3d at 442 n.4. A motor carrier may be required to reimburse the MCS-90 insurer for any payout the insurer would not otherwise have been obligated to make. The endorsement thereby presents neither a windfall for the motor carrier, nor does it alter the motor carrier's coverage under its other insurance policies. *See Bobac Trucking Inc.*, 107 F.3d at 736.

With this background, we turn to our analysis of the claims here.

### III. Analysis

*A. We Adopt the Majority View*

Carolina Casualty argues we should abandon our *Empire Fire* framework because it is inconsistent with both the MCS-90's intended purposes and the interpretation of the endorsement by the majority of other circuits. We agree, and conclude the MCS-90 endorsement is intended to impose a surety obligation on the insurance company.

Consequently, when an injured party obtains a negligence judgment against a motor carrier, an insurer's obligation under the MCS-90 endorsement is not triggered unless (1) the underlying insurance policy (to which the endorsement is attached) does not provide liability coverage for the accident, and (2) the carrier's other insurance coverage is either insufficient to meet the federally-mandated minimums or non-existent. Once the federally-mandated minimums have been satisfied, however, the endorsement does not apply.

Next, we discuss the reasoning behind our change in MCS-90 interpretation and application.

1. Surety Nature of the MCS-90 Endorsement

Carolina Casualty correctly notes that the regulatory framework underscores the surety nature of the MCS-90 obligation. It argues the endorsement should act as a safety net to protect the public where none of a motor carrier's liability insurance policies satisfies at least a minimum amount of an injured party's judgment.

We conclude the MCS-90 endorsement is intended to act as a surety for two reasons. Initially, as explained above, the regulations provide a series of alternatives for satisfying the requisite proof of a motor carrier's financial responsibility under the MCA: (1) an MCS-90 endorsement attached to an insurance policy, (2) a surety bond, or (3) FMCSA-authorized self-insurance. *See* 49 C.F.R. § 387.7(d); *Distrib. Servs., Inc.*, 320 F.3d at 489. Because each of these alternatives equally satisfy the public financial responsibility requirements prescribed by the FMCSA, the concepts underlying the second and third alternatives are informative in understanding the nature of the MCS-90 obligation.

A surety bond, evidenced by an MCS-82 form, *see* 49 C.F.R. § 387.15, Illus. II, is a surety on its face. The MCS-82 form provides:

> This bond assures compliance by the Principal [motor carrier] with the applicable governing provisions, and shall inure to the benefit of any person or persons who shall recover a final judgment or

judgments against the Principal for public liability . . . . *If every final judgment shall be paid for such claims resulting from the negligent operation, maintenance, or use of motor vehicles in transportation subject to the applicable governing provisions, then this obligation shall be void, otherwise it will remain in full effect.*

*Id.* (emphasis added). By the express terms of the MCS-82 form, the surety's obligation under the bond is inapplicable if a final negligence judgment against a motor carrier is paid from other sources. Rather, the surety's obligation to an injured member of the public only arises if there is an unsatisfied judgment.

Similarly, the third alternative of self-insurance requires a motor carrier to demonstrate to the FMCSA a financial ability to satisfy a negligence judgment. *See id.* § 387.309(a). As part of this option, the motor carrier must, among other things, demonstrate it

> has established, and will maintain, an insurance program that will protect the public against all claims to the same extent as the minimum security limits applicable to [the motor carrier] . . . . Such a program may include, but not be limited to, one or more of the following: Irrevocable letters of credit; irrevocable trust funds; reserves; sinking funds; third-party financial guarantees, parent company or affiliate sureties; excess insurance coverage; or other similar arrangements.

*Id.* § 387.309(a)(2). Under this approach, nothing prevents the motor carrier from obtaining liability insurance coverage from an outside insurer that would otherwise satisfy any potential negligence liability obligations for the carrier's accidents. In this way, the self-insurance option may also operate as a suretyship rather than as primary insurance coverage.

This regulatory structure suggests the MCS-90 endorsement operates in much the same way as the two alternatives—i.e., as a surety in the event judgment against the carrier is for some reason unsatisfied. Conceivably, the motor carrier may carry adequate insurance coverage providing recovery—at least to the FMCSA prescribed minimums—for a judgment in favor of an injured party. Or, the carrier may choose to pay the judgment out of its own pocket. In either of these cases, the purposes behind the MCS-90 are satisfied, and the endorsement is unnecessary. *See id.* § 387.1 ("The purpose of these regulations is to . . . assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways."). On the other hand, if, for example, the carrier fails to maintain insurance (or sufficient insurance) on a truck involved in an accident and fails to pay out of its own pocket for its liability to the injured party, the MCS-90 endorsement's purpose is clearly implicated. The endorsement in this circumstance would effectuate a minimum level of recovery for the injured party from the MCS-90 provider.

The second reason for finding the MCS-90 operates as a surety is because, by its express terms, the endorsement provides that while

> the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence, . . . [t]he insured agrees to reimburse the company for any payment made by the company . . . that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

-26-

*Id.* § 387.15, Illus. I. Nothing precludes the motor carrier from paying the judgment itself or obtaining the payment from other insurance sources. The endorsement obligates the underlying insurer to make this payment not in the motor carrier's stead, but to ensure a minimum level of satisfaction of a public liability judgment. *See id.* (noting the insurer's obligation is "irrespective of the financial condition, insolvency or bankruptcy of the [motor carrier]"). This is exactly the way a surety obligation is designed to operate. *See* Peter A. Alces, The Law of Suretyship and Guaranty § 1:1 (2009) ("The essence of suretyship is the undertaking to answer for the debt of another. The surety's liability is coextensive with that of the debtor and arises only when the debtor fails to discharge his duties or to respond in damages for that failure.").

In short, the surety concept flows naturally from the purpose and text of the governing regulatory provisions.

2. Trigger for MCS-90 Endorsement

With this understanding of the surety nature of the MCS-90 endorsement, we move to the conditions that trigger its application. As discussed above, the relevant purpose of the Motor Carrier Act was to ensure a motor carrier's financial responsibility for negligence liability, not to preempt state insurance law or contracting principles. We thus agree with Carolina Casualty that an MCS-90 endorsement, rather than fundamentally altering the terms of the underlying

-27-

insurance policy, operates to ensure payment of a minimum amount of an injured party's judgment against a negligent motor carrier.

The MCS-90 endorsement comes into play, then, only where (1) the underlying insurance policy to which the endorsement is attached does not otherwise provide liability coverage, and (2) the carrier's other insurance coverage is either insufficient to satisfy the federally-prescribed minimum levels of financial responsibility or is non-existent. This conclusion flows from the language of the MCS-90 endorsement, and the nature of the coverage provided by it.

*Textual Provisions*

As an initial matter, an understanding of when the MCS-90 endorsement comes into play can be obtained by examining two seemingly divergent provisions in the MCS-90 endorsement: the first provision dictates that "no condition, provision, stipulation, or limitation contained in the policy . . . shall relieve the [insurance company] from liability or from the payment of any final judgment, within the limits of liability herein described"; and the second provision requires that "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company." 49 C.F.R. § 387.15, Illus. I.

The first provision requires the insurer to pay a public liability judgment—entered against the motor carrier for negligence with respect to

-28-

vehicles subject to the financial responsibility requirements—whether or not the events giving rise to the judgment come within the policy's express coverage. *See id.* (requiring payout even if the particular vehicle involved in an accident was for some reason not "specifically described in the policy" or was driven on a route the carrier was not authorized to serve, and "irrespective of the financial condition, insolvency or bankruptcy of the insured"); *see also Larsen Intermodal Servs., Inc.*, 242 F.3d at 671. At first blush, the provision appears to automatically invalidate any contrary or limiting terms in the underlying insurance policy.

The second provision, however, reiterates the underlying insurance policy remains in force on its original terms as between the motor carrier and the respective insurance company. Any policy exclusions, or outright lack of coverage by the policy for the accident at issue, remain valid and enforceable as between the motor carrier and its insurer. This conclusion is supported by the endorsement's reimbursement provision: if the insurer would not have been obligated to pay the judgment absent the endorsement, the insurer is entitled to reimbursement by the motor carrier. *See* 49 C.F.R. § 387.15, Illus. I ("The insured agrees to reimburse the company . . . for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in . . . [the MCS-90] endorsement."). The motor carrier therefore is free to negotiate the terms of its insurance policies with

various insurers as it sees fit. Consequently, with respect to the ultimate allocation of responsibility, the MCS-90 endorsement should be irrelevant.[10]

*Nature of the Obligation*

Notably, the endorsement and the underlying insurance policy, while linked, impose different obligations based on different requirements. An insurance policy typically imposes an obligation to indemnify (i.e., pay without reimbursement) on the insurance company based on the policy's coverage of a particular risk. The endorsement, on the other hand, imposes an obligation on the insurance company to make payment in the first instance, based on a final judgment entered against the motor carrier and subject to possible reimbursement by that carrier.

It is therefore helpful to distinguish between the two types of protection at play when a motor carrier is responsible for an accident causing injury to a member of the public. First, there is a *public financial responsibility* embodied in the MCS-90 (and in the other two alternatives prescribed by 49 C.F.R. § 387.7(d)): liability for a judgment rendered against a motor carrier in favor of an injured member of the public for negligence. An insurer guaranteeing a motor carrier's public financial responsibility presents a readily accessible *source* for

_____

[10] This interpretation of the two provisions is preferable since the language of the endorsement is mandated by the regulations and cannot be altered. *See* Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 58 Fed. Reg. 60,734, 60,742 (Nov. 17, 1993) (stating "the prescribed text of the [MCS-90 endorsement] may not be changed").

satisfaction of the judgment irrespective of the ultimate apportionment of insurance liability. This liability, by itself, imparts no duty to defend or right of subrogation to the insurance company. As the endorsement makes clear, although the MCS-90 insurer may be obligated to pay a liability judgment against the motor carrier, the insurer can obtain indemnification *from the insured party*—the motor carrier. In essence, the MCS-90 is a guarantee an injured member of the public will obtain at least a portion of his or her judgment regardless of the ultimate allocation of liability and regardless of the financial health of the motor carrier.

The other type of liability—and more widely understood—is the *insurance liability*. A motor carrier insures itself against possible liability in its business operations. Based on the insurance policy limits and in exchange for a premium paid, an insurance company agrees to cover the carrier (i.e., pay for certain liabilities *without* right of reimbursement) for the carrier's own negligence. The purpose of liability insurance is to minimize the motor carrier's risks in operating its fleet; insurance transfers a certain amount of risk from the trucking company to its insurer. Further, the insurance company providing liability insurance has a duty to defend the carrier in a lawsuit for negligence and may be ultimately on the hook for any judgment against the carrier.

The insurance company has an incentive to ensure the motor carrier operates its business in a safe manner; the insurance company can increase

-31-

premiums, drop its coverage, or refuse to renew the policy in response to risks raised by the motor carrier's operation. The motor carrier, having obtained liability insurance coverage, is typically obligated to pay two possible expenses: (1) the premium for the policy, and (2) any portion of a negligence judgment exceeding all applicable insurance policy limits. The insurance company in turn is obligated to pay (without right of reimbursement from the carrier) for the motor carrier's defense and liability costs covered by the policy, typically only up to the policy's stated limits.

To accomplish the MCS-90's suretyship purpose, the endorsement—when triggered—reads out "only those clauses in the policy that would limit the ability of a third party victim to recover for his loss." *Larsen Intermodal Servs., Inc.*, 242 F.3d at 673 (quoting *Carolina Cas. Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 312 (5th Cir. 1978)). This purpose, however, is *not* implicated where there is an allocation of responsibility as between multiple insurers. *Id.* ("But there is no need for or purpose to be served by this supposed automatic extinguishment of a clause insofar as it affects the insured or other insurers who clamor for part or all of the coverage." (quotation and brackets omitted)). The MCS-90 should not render the endorsement-insurer primary, or co-primary, as a matter of law where the underlying policy provides otherwise. *See id.* ("[T]he MCS-90 states that 'all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding

-32-

between the insured and the company.'"). "[I]t follows that when the protection of injured members of the public is not at stake, the MCS-90 and the relevant federal regulations do not address coverage for the purpose of disputes between the insured and the insurer." *Id*; *see Empire Fire & Marine Ins. Co. v. J. Transport, Inc.*, 880 F.2d 1291, 1298 (11th Cir. 1989) ("It is clear that while ICC regulations require the carrier, or its certified insurer, to protect the public from loss due to negligent acts, the regulations do not alter or affect the obligations between the insured and the insurer, or where there is more than one insurer, the apportionment of liability between them.").

Additionally, the MCS-90 endorsement is "not an ordinary insurance provision to protect the insured. The endorsement does not extinguish the debt of the insured." *Travelers Indem. Co. of Ill. v. W. Am. Specialized Transp. Servs., Inc.*, 409 F.3d 256, 260 (5th Cir. 2005). The MCS-90 endorsement instead grants the insurer the right to seek reimbursement from the insured party for "any payment made by the company on account of any accident, claim or suit involving a breach of the terms of the policy, and for any payment that [the insurance company] would not have been obligated to make under the provisions of the policy except for the agreement contained herein." 49 C.F.R. § 387.15, Illus. I; *see also W. Am. Specialized Transp. Servs., Inc.*, 409 F.3d at 260 ("[The endorsement] transfers the right to receive the insured's debt obligation from the judgment creditor to the insurer."). Such a right of reimbursement is triggered

-33-

only if there is no coverage under the insurer's policy. *Larsen Intermodal Servs., Inc.*, 242 F.3d at 673.

In sum, the MCS-90 endorsement creates an obligation entirely separate from other obligations created by the policy to which it is attached. The MCS-90 defines the insurer's *public financial responsibility* obligation, while the underlying policy defines the insurer's *insurance liability* obligation. It would make no sense to jump to the insurer's MCS-90 endorsement obligation if the underlying insurance policy already provides coverage for the accident.

*Triggering Circumstances*

It follows from the regulatory scheme and the text of the endorsement that the surety obligation is triggered only when the underlying insurance policy does not provide coverage *and* either (1) no other insurance policy is available to satisfy the judgment against the motor carrier, or (2) the motor carrier's insurance coverage is insufficient to meet the federally-mandated minimum level. *See Distrib. Servs., Inc.*, 320 F.3d at 490; *Larsen Intermodal Servs., Inc.*, 242 F.3d at 672.

First, if no other insurance policy is available the purposes behind the MCS-90 are clearly implicated. As the majority of circuits have recognized, the "primary purpose of the MCS-90 is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers." *John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 857 (9th Cir. 2000). Where, for example,

a motor carrier fails to obtain insurance on a particular vehicle[11] or driver, no liability policy would extend to cover the carrier's potential negligence on the public highways. If an injured party obtains judgment, he or she would be left to rely solely on the financial stability of the motor carrier to satisfy judgment. This is the exact situation the endorsement contemplates and is designed to address. *See* 49 C.F.R. § 387.15, Illus. I (stating the endorsement imposes an obligation on the MCS-90 insurer to make "payment of any final judgment . . . irrespective of the financial condition, insolvency or bankruptcy of the insured").

Under this scenario, the motor carrier becomes a judgment-debtor to the injured party, the judgment-creditor. The endorsement would then operate to read out any exclusions or limitations and thereby require the MCS-90 insurer, as a surety, to pay the injured party. However, the "endorsement does not extinguish the debt of the insured; it transfers the right to receive the insured's debt obligation from the judgment creditor to the insurer." *W. Am. Specialized Transp. Servs., Inc.*, 409 F.3d at 260. And most importantly, it merely shifts the risk of non-payment from the injured party to the MCS-90 insurer. *See* 49 C.F.R. § 387.15, Illus. I (stating the insurance company has a right to reimbursement from the motor carrier for payment of such a judgment). In this way, the endorsement satisfies its public policy purpose.

---

[11] For example, a motor carrier may lease a truck and fail to carry any insurance policy extending coverage to leased vehicles.

Second, and similarly, the endorsement may be implicated where the sum of all liability coverage applicable to a motor carrier's accident is insufficient to meet the financial responsibility minimums. This situation may arise where all the motor carrier's insurance policies providing coverage for a specific accident have policy limits, in aggregate, which are set too low.

The federal regulatory scheme provides for different minimum financial responsibility coverage amounts. Motor carriers must maintain at least $750,000 in financial responsibility coverage for vehicles transporting non-hazardous cargo, $1 million for vehicles transporting oil and certain hazardous substances, and $5 million for other hazardous substances and radioactive materials. *See id.* § 387.9. Motor carriers may obtain multiple MCS-90 endorsements attached to multiple insurance policies, each providing proof of the requisite level of financial responsibility for a particular type of cargo. *See* Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 62 Fed. Reg. 16,370, 16,403 (Apr. 4, 1997). Or, alternatively, as in this case, the motor carrier may obtain one policy with an attached endorsement meeting the highest requisite minimum for the type of cargo it transports. The carrier may then maintain other insurance policies covering the carrier's liability risk for various vehicles but lacking any MCS-90 endorsement, such as the State Farm policy here.

Either way, the MCS-90 endorsement may be implicated where a motor carrier *improperly* transports cargo using vehicles that are not insured up to the

requisite minimums for that cargo. In such a circumstance, the liability insurance coverage would be insufficient to meet the above minimums and the MCS-90 endorsement(s) would operate to satisfy the deficiency.

Once again, if an insurer, which otherwise has no liability for an accident but for the MCS-90 endorsement, pays out the financial responsibility minimums as governed by the regulations, that insurer is not without recourse; it may still seek reimbursement from the motor carrier.

*     *     *

In sum, today we join the majority of circuits in describing an insurer's obligation under an MCS-90 endorsement as one of a surety. After a negligence judgment is rendered against a motor carrier, the MCS-90 insurer's obligation is only triggered when (1) its underlying insurance policy does not provide liability coverage, and (2) either no other insurer provides coverage for the accident or the motor carrier's insurance coverage, in aggregate, is insufficient to satisfy the regulatory requirements.[12] Finally, we conclude the MCS-90 endorsement does not apply once the federally-mandated minimums have been satisfied.

We now address Carolina Casualty's appeal applying this framework.

---

[12] We also note that the MCS-90 financial responsibility obligation may be implicated when a motor carrier's insurer, which is obligated to pay a judgment in favor of an injured member of the public, is either insolvent or refuses to pay under its policy. In that instance, the MCS-90 insurer may be called on to satisfy the federally-prescribed minimum amount. However, as we have stated above, the MCS-90 insurer would then be free to seek reimbursement from both the motor carrier as well as the defaulting liability insurer.

-37-

*B. Application to Carolina Casualty*

Carolina Casualty argues that under the majority approach, State Farm's $750,000 payment to the Yeateses satisfied the regulatory purpose behind the FMCSA regulations. Thus, it is entitled to a declaratory judgment that it has no liability under the MCS-90 endorsement to the Yeateses. In particular, since Carolina Casualty's policy with Bingham Livestock did not cover the truck involved in the accident, it has no duties under its general liability policy. Further, because the truck was transporting non-hazardous cargo and because the State Farm Insurance payout satisfied Bingham Livestock's financial responsibility requirements, Carolina Casualty contends its duties under the MCS-90 endorsement are not implicated.

The Yeateses respond that under either the old *Empire Fire* approach or the approach we adopt today, Carolina Casualty remains potentially liable. In essence, the Yeateses contend the public liability guarantee under Carolina Casualty's MCS-90 endorsement should "stack"[13] with all other applicable liability policy limits to satisfy as much of their judgment as possible.

---

[13] The State Farm policy provided $750,000 in coverage (which it has already paid to the Yeateses). Carolina Casualty's MCS-90 endorsement provides $1 million in coverage to Bingham Livestock for any public liability judgment. At oral argument, it was unclear whether the Yeateses contended the MCS-90 limits would stack by providing an additional $1 million in coverage for a judgment in their favor or just an additional $250,000. We need not discern which contention the Yeateses were making because we find Carolina Casualty's MCS-90 endorsement equally inapplicable.

-38-

We agree with Carolina Casualty and conclude that the MCS-90 endorsement here is not triggered. First, there *is* another insurance policy, the State Farm policy, available to satisfy a liability judgment against Bingham Livestock. In fact, State Farm has already made a $750,000 policy limit payment irrespective of any actual final judgment against Bingham Livestock to the Yeateses.

Second, Bingham Livestock's insurance coverage, by virtue of the State Farm policy, is *not* insufficient to meet the federally-mandated minimum level for the type of cargo it was transporting at the time of the accident. No one disputes the truck was transporting non-hazardous cargo and that the requisite minimum level of financial responsibility was therefore $750,000. Rather, the Yeateses contend the MCS-90 endorsement language in the Carolina Casualty policy still allows for an additional recovery against Carolina Casualty. We disagree.

The Carolina Casualty policy endorsement states:

The policy to which this endorsement is attached provides primary . . . insurance . . . for the limits shown:
This insurance is primary and the company shall not be liable for amounts in excess of $1,000,000 for each accident.

R., App. at 79. The Yeateses seize on the language in the endorsement providing

[i]n consideration of the premium stated in the policy . . . the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence . . . regardless of whether or not each motor vehicle is specifically described in the policy.

-39-

*Id.* They claim this particular MCS-90 provision in conjunction with Carolina Casualty's $1 million policy limit precludes a declaratory judgment in Carolina Casualty's favor.

But the Yeateses' reading of the MCS-90 endorsement, in light of the majority approach we adopt today, is unpersuasive. The schedule of limits, attached as the second page of Carolina Casualty's MCS-90 endorsement, delineates the same limits contained in 49 C.F.R. § 387.9. R., App. at 80 (containing table with limits as prescribed by the FMCSA regulations). While Carolina Casualty's policy provided a $1 million limit, this is explained as a result of the higher limits required for transport of oil and certain hazardous cargo.

The question remains whether an insurer that provides an MCS-90 endorsement to satisfy the regulatory requirements for multiple types of cargo—non-hazardous and hazardous—necessarily exposes itself to the highest possible limits as delineated by its underlying insurance policy. We think not.

A recent Sixth Circuit case rejected a similar argument. In *Kline v. Gulf Insurance Co.*, a motor carrier chose to self-insure for $1 million, the requisite financial responsibility requirements under the FMCSA regulations for the cargo the carrier transported. 466 F.3d at 452. The carrier also obtained an excess liability insurance policy for $1 million (for claims over $1 million) and an umbrella policy for any claims above $3 million from two insurers. *Id.* The

umbrella policy apparently contained an MCS-90 endorsement.  *Id.*  Kline, the

injured party, obtained a $3.2 million judgment against the carrier, but was unable

to collect from the self-insured trucking company as it had declared bankruptcy.

*Id.*  Although Kline did collect $1 million against the excess insurer and $200,000

from the umbrella insurer,  $2 million of the judgment remained unsatisfied.  *Id.*

Kline sought to collect the additional amounts from the umbrella insurer, arguing

the attached MCS-90 endorsement operated to satisfy a portion of his unpaid

judgment.  *Id.*

The Sixth Circuit held the MCS-90 endorsement inapplicable.  Specifically,

the court noted that the "purpose of the [MCS-90] endorsement is to give full

security for the protection of the public *up to* the limits prescribed [by federal

regulation]."  *Kline*, 466 F.3d at 455 (emphasis added) (citing 46 Fed. Reg.

30,974 (1981)); *id.* at 456 ("The federal government balanced the need to

compensate victims with the needs of industry and determined the appropriate

minimum compensation for members of the public.").  Additionally, "[r]ead as a

whole, the MCS-90 incorporated the limits of liability in the original insurance

policy; it did not replace them."  *Id.* at 455.

Moreover, according to the court, the MCS-90 endorsement's language

stating "'[t]he insurance policy to which this endorsement is attached . . .  is

amended to assure compliance by the insured [with the MCA]" suggested the

insurer "intended to offer $1 million in coverage only if the law required such

coverage." *Id.* Because the carrier self-insured to the minimum regulatory amount, the court determined the MCS-90 endorsement's public policy purpose was not implicated. *Id.*

And, as Kline had already collected $1.2 million of her judgment, her recovery already exceeded the $1 million regulatory minimum level of financial responsibility for the carrier. *Id.* Thus, the court concluded the purposes underlying the MCA and the regulatory regime had been served and the MCS-90 did not operate to make the umbrella insurer liable on any amount its policy did not otherwise mandate.[14] *Id.* at 456.

This reasoning is persuasive here. The Yeateses have already collected $750,000—the regulatory minimum compensation level—from State Farm on any hypothetical judgment they may eventually receive against Bingham Livestock. Therefore the public policy purposes underlying the MCS-90 have been satisfied. The Carolina Casualty policy, by its own terms, does not extend coverage to the truck involved in the accident. Accordingly, we are unwilling to read the Motor Carrier Act and the FMCSA regulations as requiring Carolina Casualty to bear

---

[14] Kline's argument, according to the Sixth Circuit, "would force insurance companies to evaluate . . . [a motor carrier's] financial well-being before issuing secondary policies" and that such a requirement would generate significant additional and unanticipated costs. *Kline*, 466 F.3d at 456. The *Kline* court concluded that Kline was, in essence, asking the court to "rewrite the minimum compensation provisions, something . . . [the court is] unwilling to do given the language of the MCS-90 and the public policy directives already in place." *Id.*

responsibility it did not anticipate or otherwise bargain for once the public policy purposes of the regulations have been satisfied.

We therefore conclude that State Farm's $750,000 payment satisfied Bingham Livestock's minimum financial responsibility requirements under federal law and the MCS-90 endorsement attached to the Carolina Casualty policy does not supply additional coverage. The Yeateses therefore cannot recover under this endorsement.[15]

## IV. Conclusion

For the foregoing reasons, we VACATE the prior panel decision, REVERSE the district court's judgment, and REMAND to the district court for entry of judgment consistent with this opinion.

---

[15] Nothing in this opinion, though, prevents the Yeateses from pursuing their state tort suit against Bingham Livestock and holding it or other excess insurers liable for any judgment above that paid by its primary insurance carrier.