# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

Philadelphia Indemnity Insurance
Company,

               Intervenor,

            v.

Kathryn E. Bogel; Patrick Nugent;
Kenneth Bogel; Amanda Elise Rainey;
Kristlyn Araujo; Joseph Johnson;
Cassady Araujo-Johnson, Minor, by
Her Next Friends, Joseph Johnson and
Kristlyn Araujo; Leland Johnson,
Minor, by His Next Friends, Joseph
Johnson and Kristlyn Araujo; Felix;
Johnson, Minor, by His Next Friends,
Joseph Johnson and Kristlyn Araujo;
Dana Christianson; Dean DiPietro;
Cecilia Peterson; Lauren Latchford;
Kelly McGarvey; John Smith; Yaron
Miller; Barbara Oliveira; Jeffrey Darrion
Siler; Sarah Pitcock; Carol Rethemeyer;
David Rethemeyer; Rebecca Seward;
Mark Spires; Christopher Spyrzynski;
Amy Stanton; Michael Stanton; Jacinto
Vera; Rita Vera; and Sarah Heaton,
Wendy J. Gigler,

               Plaintiffs,


            v.

Jolly Trolley Transportation Service,
LLC, t/a Jolly Trolley; a/k/a Jolly
Trolley of Rehoboth Beach; Jolly
Trolley Limousine Service LLC, t/a
Jolly Trolley; a/k/a Jolly Trolley of
Rehoboth Beach; formerly known as
Jolly Trolley Car Service, LLC;
TRANSIT U., INC., t/a Jolly Trolley;

C.A. NO. K18C-09-024 JJC
(Consolidated)

a/k/a Jolly Trolley of Rehoboth Beach; :
David O. Hastings; Christine D. :
Hastings, David Turner Hastings, and :
Thomas Bernard Dowd, :
                    Defendants. :

Submitted: October 1, 2021
Decided:  December 6, 2021

## OPINION

Michael J. Malkiewicz, Esquire, and Robert J. Taylor, Esquire, BARROS, MCNAMARA, MALKIEWICZ AND TAYLOR, P.A., Dover, Delaware; and Stephen A. Markey, III, Esquire *(pro hac vice)*, and Amy M. Orsi, Esquire *(pro hac vice)*, LAW OFFICES OF MARKEY AND ORSI, Towson, Maryland, *Attorneys for the Bogel Plaintiffs.*

Scott E. Chambers, Esquire, SCHMITTINGER AND RODRIGUEZ, Dover, Delaware; and Irwin R. Kramer, Esquire *(pro hac vice)*, and James M. Connolly, Esquire *(pro hac vice)*, KRAMER AND CONNOLLY, Reisterstown, Maryland, *Attorneys for Plaintiff Wendy Gigler.*

Daniel Bennett, Esquire, MINTZER, SAROWITZ, ZERIS, LEDVA AND MEYERS, LLP, Wilmington, Delaware, *Attorney for the Defendants, Transit U, Inc., Jolly Trolley Transportation Services, LLC, David O. Hastings, Christine D. Hastings, David T. Hastings, and Thomas Dowd.*

Jeffrey A. Young, Esquire, YOUNG AND MCNELIS, Dover, Delaware, *Attorney for the Defendant, Jolly Trolley Limousine Service, LLC and Transit U, Inc.*

Bruce W. McCullough, Esquire, BODELL BOVE LLC, Wilmington, Delaware; and Ronald P. Schiller, Esquire *(pro hac vice)*, Matthew N. Klebanoff, Esquire *(pro hac vice)*, and Thomas N. Brown, Esquire *(pro hac vice)*, HANGLEY ARONCHICK SEGAL PUDLIN AND SCHILLER, Philadelphia, Pennsylvania, *Attorneys for Intervenor Philadelphia Indemnity Insurance Company.*

**Clark, R. J.**

This case arises from a 2016 accident on U.S. Route 1 Southbound, south of Dewey Beach, Delaware. When transporting thirty-one passengers to a wedding reception, a trailer marketed as the "Jolly Trolley" flipped and severely injured many of its passengers.

The insurance company that intervenes in this case insured two of the several defendants. Close to the eve of trial, the company withdrew its defense of those two defendants. Then, absent the insurance company's participation, the plaintiffs and defendants settled the case through consent judgments in the combined amount of $6.1 million.

This decision addresses the insurance company's obligation to pay those consent judgments in favor of twenty-nine injured plaintiffs (the plaintiffs and defendants who settled are hereinafter collectively referred to as the "Settling Parties"). The Settling Parties seek full summary judgment and a declaration that the insurance company must pay up to $5 million to satisfy unpaid portions of the judgments. In response, the insurance company opposes full summary judgment. It seeks partial summary judgment, however, on a single issue. It requests a declaration that it need not pay the judgment on behalf of one of its two named insureds.

To decide these cross-motions, the Court must examine three issues. First, the Court must determine whether a $5 million commercial policy requires the company to provide indemnity coverage for the vehicles involved in the accident. That question turns on whether the policy's Commercial Automobile Elite Endorsement (the "Elite Endorsement") expands coverage to require the insurer to pay.

Second, if the "Elite Endorsement" did not expand the insurer's coverage obligation to indemnify its insureds, the Court must examine a federal motor carrier endorsement (the "MCS-90B" or "federal endorsement") to the policy. That

3

endorsement may require the insurance company to perform as a surety and pay the judgment notwithstanding the lack of indemnity coverage.

Third, if either the Elite Endorsement or the MCS-90B applies, the Court must determine if the consent judgments are enforceable against the insurance company. To do so, the Court must determine whether its insureds consented to the judgments fraudulently, collusively, or in bad faith.

For the reasons below, the plain language of the policy controls the first two-steps of the Court's analysis. First, the Elite Endorsement does not provide coverage for the $6.1 million in consent judgments. As to the second step, the MCS-90B nevertheless requires the insurance company to pay up to $5 million to satisfy the consent judgments entered against one of its insureds. Because the insurance company identifies no material issue of fact that supports its claim that the Settling Parties fraudulently, collusively, or in bad faith settled the matter, the consent judgments are valid and enforceable against the insurance company.

## I.   RELEVANT BACKGROUND

The cross-motions address coverage issues that arose during an underlying personal injury suit. To decide these motions, the Court must consider the facts of record in the underlying tort case ("Part I" of the litigation) and supplemental facts developed during discovery in the coverage portion of the case ("Part II" of the litigation). Furthermore, many of the facts of record relevant to the Court's coverage decision arise from the procedural actions taken by the parties at the end of Part I. Finally, as necessary background, the Court will describe the two relevant policy endorsements. The language in the Elite Endorsement controls the first question. The language of the MCS-90B, and the federal regulations that create it, answer the second question.

4

## A. The Summary Judgment Record and Procedural History

The recited facts are those included in the summary judgment record. Because there are cross-motions that implicate different issues, the Court recites the corresponding facts of record in the light most favorable to the non-moving party as to each issue.

On October 1, 2016, Defendant Thomas Dowd drove a Jolly Trolley van and trailer with thirty-one wedding guests southbound on Coastal Highway between Dewey Beach and the Indian River Inlet. Mr. Dowd intended to drive the passengers to a wedding reception at the Indian River Life Saving Station. When doing so, he accelerated to approximately forty miles per hour. At that point, the trailer holding the passengers began to fishtail. It then flipped. The accident injured many of the passengers, some severely.

Prior to the day of the accident, the wedding planner had contracted with Defendant Transit U. Inc. ("Transit") to transport the guests on the Jolly Trolley. At the time of the accident, the three defendant business entities traded collectively as "Jolly Trolley." Those related entities included (1) Transit, (2) Jolly Trolley Limousine Service, LLC ("Limo"), and (3) Jolly Trolley Transportation Service, LLC ("Transportation"). The Hastings family, David O. Hastings, Christine D.L. Hastings, and David T. Hastings (collectively the "Hastings") were the stockholders of Transit. Transit, in turn, was the sole member of the other two defendant limited liability companies, Limo and Transportation.

Transit negotiated all contracts, paid bills, and maintained the joint office space used by the three business-entity defendants. Transit also maintained a website on behalf of itself and the other two businesses. Transit also employed the drivers for all three entities. Transit leased vehicles from Transportation and Limo to fulfill many of its contracts.

5

On the day of the accident, Transit leased the Jolly Trolley van and trailer from Transportation. Mr. Dowd, as Transit's employee, drove the Jolley Trolley that day. Limo did not directly or indirectly participate in the events culminating in the accident.

Three insurance carriers provided potential coverage for this incident. First, National Indemnity Company ("NICO") insured Transit and Transportation with a $1 million liability policy. Second, Trumble Insurance Company provided the van's driver, Mr. Dowd, with $30,000 in coverage. The third carrier, Philadelphia Indemnity Insurance Company ("PIIC") provided two of the Jolly Trolley entities (Transit and Limo) with $5 million in liability coverage.

The PIIC policy provided indemnity and defense coverage to Transit and Limo for scheduled vehicles only. The policy did not list the van and trailer involved in the accident. The Settling Parties, however, contend that the policy's Elite Endorsement expands PIIC's obligation to provide coverage to Transit and Transportation for the accident.

Furthermore, the PIIC policy imposes a separate suretyship obligation upon PIIC to cover non-scheduled vehicles. The parties do not dispute that the MCS-90B endorsement that attaches to the policy may require PIIC to pay judgments on behalf of Limo. Among the defendants, however, Limo had the most questionable liability. In fact, other than possible alter ego liability (not cognizable in a court of law), there is no evidence of record supporting that Limo contributed to the accident or the injuries in this case. Accordingly, the central dispute in this case turns on whether the MCS-90B covers Transit.

By July 2018, the defendants' broker had provided notice to PIIC regarding the injured parties' claims. At that point, PIIC retained eService Claims, LLC to investigate the accident and potential claims. An eService report sent to PIIC on

6

July 27, 2018, provided PIIC notice that Transit leased the van and trailer involved in the accident from Transportation.

After the accident, the injured plaintiffs filed two lawsuits. One suit included twenty-nine plaintiffs (the "Bogel plaintiffs"). Another injured party, Wendy Gigler, filed a separate suit. The Court consolidated the actions. The combined suit included claims against three business entity defendants, Mr. Dowd, and the Hastings.[1] By October 15, 2018, PIIC had retained counsel for its two insureds, Transit and Limo. At that point, it did so *without* a reservation of rights.

On January 31, 2019, PIIC first reserved its rights under the policy through a letter to Christine Hastings (the "January 2019 Letter"). In the January 2019 Letter, PIIC denied coverage under the policy. It did so because the vehicles involved in the accident were not scheduled. Nevertheless, PIIC acknowledged in the letter that it would continue to provide a defense to Limo and Transit. It explained it had a potential suretyship obligation *to both* Transit and Limo under the MCS-90B endorsement. It now refers to the nature of the defense that it provided to Transit and Limo as a "courtesy defense."

Thereafter, the parties conducted discovery during Part I of the litigation regarding the plaintiffs' personal injury claims. There, the plaintiffs documented greater than $2.8 million in boardable damages.[2] In discovery, most of the injured plaintiffs alleged persistent injuries, and many alleged permanent injuries. Their injuries ranged from post-traumatic stress disorder to serious spinal fractures. For instance, one plaintiff sustained a C1 Jefferson fracture with a vertebral artery

---

[1] The plaintiffs originally sued a fourth Jolly Trolley entity, Jolly Trolley School Bus, LLC, ("Bus"). The parties, however, stipulated to the dismissal of all claims against Bus.

[2] In response to the Plaintiffs' claimed boardable damages, PIIC has identified no evidence of record refuting the amount. Namely, it identifies no evidence of record that supports that the boardable damages identified by the Settling Parties were unreasonable considering the extent of the injuries presented by the thirty plaintiffs.

7

dissection, two rib fractures, and a head injury. Another plaintiff suffered a spinal compression fracture, three bulging discs, and persistent headaches resulting from post-concussive syndrome. Yet another plaintiff suffered T11, T12 and L1 compression fractures, and another suffered a traumatic brain injury.

In addition to evidence that would have supported significant compensatory damages, the defendants faced significant exposure to punitive damages. Most importantly, Transit had such exposure as the defendant that contracted for the service, leased the vehicles, and employed Mr. Dowd. Namely, the record in Part I of the litigation included evidence that: (1) Mr. Dowd drove recklessly by accelerating to forty miles per hour while pulling a trailer on a highway with thirty-one persons on it; (2) Mr. Dowd, Transit, and the other defendants knew that such speed would cause the trailer to fishtail; (3) Transit and the Hastings defendants knew the danger of pulling the trailer over thirty miles per hour, yet took no action to prevent such driving; (4) Transit and the other defendants failed to properly train Mr. Dowd on safety procedures; (5) Mr. Dowd pulled the wedding guests on the trailer despite Transit and the other defendants' knowledge that such a large number of guests made the trailer grossly overweight; and (6) Transit and the other defendants failed to ensure that Mr. Dowd had properly secured the Jolly Trolley trailer to the towing van prior to the accident. The record also contains expert accident reconstruction opinions that the defendants' operational- and maintenance-related misconduct caused the accident.[3] Those facts, and other facts of record, strongly supported a state of mind inference of recklessness as to Transit, the Hastings defendants, and Mr. Dowd, at a minimum.

---

[3] Pl. Bogel Mot. Summ. J., Ex. 4. The accident reconstruction report provided by Cover Consulting, Inc. outlines in detail the cause of the accident, the negligent maintenance of the trailer itself, the failure to provide safety features in the van, and several other instances of conduct relating to the defendants' liability.

8

As discovery closed in Part I in July 2020, the plaintiffs and defendants participated in what was then a second mediation. PIIC participated but did not offer a significant contribution toward settlement. At that point, PIIC and the Settling Parties' interests diverged rapidly. Namely, PIIC directed the attorney it had hired to defend Limo to file a summary judgment motion on Limo's behalf. Although PIIC had assumed Transit's defense, at that point it began to assert that the MCS-90B endorsement covered only Limo. PIIC further contends that Limo had no relationship to the events at issue and therefore had no liability exposure. At the time PIIC directed the attorney to file a summary judgment motion for Limo, Limo had retained separate counsel. Limo's private counsel directed Limo's PIIC-retained attorney not to file the summary judgment motion on Limo's behalf. As a result, on August 14, 2020, PIIC ordered its attorneys to withdraw from representing Transit and Limo. When doing so, PIIC relied on its January 2019 reservation of rights.

At the time of the requested withdrawal, trial was scheduled for November 2, 2020. At the point, Transit, at a minimum, faced considerable excess liability exposure. There was also significant evidence of the negligence and recklessness of the other defendants except for Limo. The plaintiffs alleged that all defendants were independently liable based on their negligence and that all would be separately liable based upon alter ego liability. Although this Court has no jurisdiction to hear the latter claim, the defendants commingled resources and functions to such a degree that more of them than merely Transit risked liability for the accident. At that time, NICO and Trumble tendered their limits. Their $1,030,000 in coverage was insufficient for such a high level of exposure.

The next procedural matter of importance was the Settling Parties' entry into parallel Stipulation Agreements, Consents to Judgment, Assignments of Rights, and

9

Covenants Not to Execute (collectively the "Agreements").[4]  The Settling Parties structured one of the two Agreements to address the Bogel plaintiffs' claims and one to address Ms. Gigler's claim.   The Settling Parties also stipulated to certain facts that they felt would be useful in Part II of the litigation.   The defendants then filed an Offer of Judgment on August 31, 2020, in favor of the Bogel plaintiffs in the amount of $4,824,723.60 to mirror the amount of the consented-to judgment.[5]   Four days later, the defendants filed a separate Offer of Judgment in favor of Ms. Gigler in the amount of $1,205,276.40.  Finally, the Bogel Agreement recited that NICO agreed to pay $824,000 toward the Bogel plaintiffs' judgments.  Separately, the Gigler Agreement recited that NICO and Trumble agreed to pay $236,000 toward Ms. Gigler's judgment.

Next, while the two motions for entry of judgment awaited approval, PIIC moved to intervene to protect its interests.  The Settling Parties did not oppose (1) PIIC's motion to intervene or (2) PIIC's request to permit its attorneys to withdraw from representing Transit and Limo.  In turn, PIIC agreed not to oppose the entries of judgment but requested that the Court preserve its right to contest whether it had an obligation to pay them.

On September 11, 2020, the Court held a hearing, considered the parties' positions, and approved joint and several entries of judgments against the defendants.  It also permitted PIIC-hired counsel for Limo and Transit to withdraw their representation.

After PIIC intervened, the parties conducted additional discovery in Part II of the litigation.  Pursuant to PIIC's amended petition for intervention, it demanded a jury trial on the coverage issues.   In its petition, it seeks a declaration that the MCS-

---

[4] The Settling Parties entered parallel agreements separately as to the Bogel plaintiffs and the Gigler plaintiff.  The agreements differ only as to the judgment amounts.

[5] The Bogel complaint included twenty-nine separate plaintiffs that alleged various injuries, as well as claims for loss of consortium, general damages, and special damages.

90B does not cover Transit. It also alleges alter ego liability, fraud against all defendants, and claims that the defendants tortiously interfered with its contract with Limo.

Through approximately 450 pages of briefing and two oral arguments, the parties presented arguments in support of their cross-motions. After the second oral argument, the Court requested supplemental submissions regarding certain issues.

Most recently, on September 30, 2021, Ms. Gigler notified the Court that she and PIIC had resolved her claims. The Bogel plaintiffs and the defendants are the remaining Settling Parties. Accordingly, the Court's decision addresses only their rights and PIIC's obligation to pay the judgments entered on behalf of the Bogel plaintiffs.

### B.  The Elite Endorsement

The PIIC commercial policy covers only Transit and Limo. It provides $5 million in indemnity coverage. The policy also contains a schedule that identifies and limits its coverage to scheduled vehicles only. The parties do not dispute that the main policy covers only scheduled vehicles and that the van and trailer were not scheduled.

The policy also includes a Commercial Automobile Elite Endorsement which provides additional coverage beyond that provided by the main policy. By its terms, this endorsement applies when no other specific coverage in the policy applies.[6] In relevant part, it amends the definition of who is an insured as follows:

> SECTION II – LIABILITY COVERAGE
>
> A. Coverage, 1. Who Is An Insured is amended by adding the
>   following:

---

[6] Pl. Gigler Mot. Summ. J., Ex. O (Elite Endorsement).

11

.   .   .   .

4. Lessor of Leased Autos – The lessor of a "leased auto" is an "insured" only for "bodily injury" or "property damage" resulting from the acts or omissions by:

        a. You;

        b. Any of your "employees" or agents; or

        c. Any person, except the lessor or any "employee" or agent of the lessor, operating a "leased auto" with the permission of any of the above.

Any "leased auto" in the policy schedule will be considered a covered "auto" you own and not a covered "auto" you hire or borrow.

The coverages provided under this endorsement apply to any "leased auto" in the policy schedule until the expiration date of the lease, or when the lessor or his or her agent takes possession of the "leased auto" whichever occurs first.

"Leased auto" means an "auto" leased or rented to you, including any substitute, replacement or extra "auto" needed to meet seasonal or other needs, under a leasing or rental agreement that requires you to provide direct primary insurance for the lessor.[7]

At the time of the accident, Transit (a PIIC insured) leased the trailer and van from Transportation (*not* a PIIC insured). The lease was of triple-net nature. As such, the lease contained a clause that required Transit to maintain "auto liability insurance" on the van and trailer leased by Transit.[8]

---

[7] *Id.* at ¶ 4.

[8] Pl. Gigler Mot. Summ. J., Ex. E (Lease).

## C. The MCS-90B Endorsement

The PIIC policy issued to Transit and Limo also included a federally mandated MCS-90B endorsement.[9] Polices frequently cover only scheduled automobiles. Pursuant to federal regulation, one option for motor carriers to meet minimum financial responsibility requirements is for carriers to secure an MCS-90 endorsement or an MCS-90B endorsement to supplement their insurance policies.[10] The MCS-90B, which applies to motor carriers of passengers, places a $5 million suretyship obligation upon PIIC as follows:

> the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment received against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Section 18 of the Bus Regulatory Reform Act of 1982 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. . . . It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described irrespective of the financial condition, insolvency, or bankruptcy of the insured.[11]

---

[9] *See* 49 C.F.R. § 387.39 (providing that the endorsements for policies of insurance (Form MCS-90B) must be in the form prescribed by the FMCSA and are available for download at http://www.fmcsa.dot.gov/mission/forms). *See* Pl. Gigler Resp., Ex. O (providing the MCS-90B form issued in this case).

[10] *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57-58 (2d Cir. 2012) (noting that case law discusses the MCS-90 and MCS-90B Endorsements interchangeably as they are parallel endorsements). The MCS-90 is the form that a motor carrier of property in interstate or foreign commerce files to comply with the minimum financial responsibility requirements. The MCS-90B is the form that a motor carrier of passengers in interstate or foreign commerce files to meet the same financial requirements. The regulations addressing the two endorsements' requirements are the same in all respects relevant to this case. *See* 49 C.F.R. § 387.70(d)(1) (providing the proof of financial responsibility shall consist of Form MCS-90); *Id.* § 387.31(d)(1) (providing the proof of financial responsibility shall consist of Form MCS-90B).

[11] Pl. Gigler Resp., Ex. O, at 68.

In this regard, the MCS-90B requires the insurer to pay judgments entered against the insured motor carrier, even if the vehicle involved in the loss was not scheduled or otherwise covered under the policy.[12]   Specific to this case, the MCS-90B obligates PIIC to perform as a surety for any entity covered by the endorsement. As a surety, PIIC has the right to seek reimbursement from its insured or insureds if it must pay a judgment on their behalf.[13]

Furthermore, in contrast to the liability policy, the MCS-90B does not independently require PIIC to defend its insured or insureds.[14]   Nevertheless, until approximately six weeks before the scheduled trial, PIIC provided both its named insureds, Limo and Transit, a defense.  Its stated reason for doing so was (1) to protect its interests and (2) its acknowledgment that the MCS-90B may cover Transit and Limo.[15]   During summary judgment briefing and argument, it referred to the nature of that defense as a mere "courtesy defense."

In the MCS-90B attached to the PIIC policy, the endorsement lists only one of PIIC's two named insureds next to the "Issued to" line at the top of the endorsement.  Limo, which is an undisputed motor carrier as defined in the federal regulations, is the only listed entity on the MCS-90B.[16]   While Transit is a named insured on the policy, Transit is not listed on the MCS-90B endorsement.

Thus, the central issue in this case turns on the parties' dispute regarding what the federal endorsement means when it provides that PIIC must pay judgments entered against its "insured."   Argument regarding how to interpret the federal

---

[12] Larry Rabinovich, *The MCS-90 Endorsement and the Tripartite Relationship*, 62 No. 12 DRI for Def. 68, 69 (Dec. 2020).

[13] *Id.* at 70.

[14] *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 879 (10th Cir. 2009).

[15] PIIC Mot. Summ. J., Ex. U, at 6 (stating in the reservation of rights letter "because of a potential obligation to satisfy any final judgment pursuant to the [MCS-90B]" PIIC will provide a defense to Transit *and* Limo) (emphasis added).

[16] *Id.* at Ex. T, p.68.

regulations and guidance issued by the Federal Motor Carrier Safety Administration of the Department of Transportation ("FMCSA") commanded a significant portion of the parties' efforts. Accordingly, the Court will discuss the regulations and the regulatory guidance more fully below.

## II.   THE PARTIES' ARGUMENTS

The Settling Parties contend that the Elite Endorsement expands coverage under the policy.   They argue that this expanded coverage permits the plaintiffs, through an assignment of rights, to collect their judgments from PIIC.

The Settling Parties initially argued that the Elite Endorsement expanded PIIC's obligation to cover non-scheduled vehicles that Transit leased from another party, provided the lease between Transportation and Transit meets certain requirements.  Transit, as a named insured, had entered a triple-net lease with Transportation.  The lease required Transit to buy automobile insurance for the van and trailer that Transportation leased to Transit.  Accordingly, they contended that the Elite Endorsement expanded who was an insured and provided coverage for this accident.

The Settling Parties then modified their position.  Most recently, they have contended that Transportation (which is not a named insured) became a covered entity pursuant to the Elite Endorsement.  According to them, Transportation became an additional insured because it leased the vehicles involved in the accident to Transit.

PIIC has also modified its arguments regarding the Elite Endorsement over time.   Namely, PIIC first contended that the lease between Transit and Transportation did not specify that Transit was responsible to pay for "direct primary

15

insurance coverage" for Transportation.[17]  Rather, the lease required Transit to obtain "auto liability insurance."[18]  In that vein, it contended that the van and trailer did not become "Leased Autos" and thus did not qualify as covered vehicles.  PIIC also stressed that the Settling Parties did not claim coverage under the Elite Endorsement until they filed their summary judgment briefs.  Accordingly, it contended that Transit and Limo waived their right to claim coverage under the Elite Endorsement.

PIIC's primary contentions then shifted and focused more upon the Elite Endorsement's plain language.  PIIC stressed that the language in the endorsement expanded the definition of who was an insured, but nevertheless did so for only scheduled vehicles.  Because the main policy did not cover vehicles that Transit or Limo hired or borrowed, and the van and trailer were not vehicles listed in the policy, PIIC still contends that the van and trailer had no coverage notwithstanding the Elite Endorsement.

Regarding the MCS-90B, the Settling Parties emphasize that the endorsement applies to vehicles that are not scheduled in the policy.  According to the Settling Parties, the MCS-90B requires PIIC to pay judgments entered against any named insured listed *on the policy*.  The Settling Parties also contend that PIIC waived its right to contest coverage under the MCS-90B because PIIC did not send the January 2019 letter until mid-suit.  Furthermore, they contend that PIIC's decision to provide a defense until the eve of trial, and then to withdraw that defense, estops PIIC from now denying coverage.

In response, PIIC argues that the MCS-90B does not provide coverage for the accident because the endorsement is "Issued to" only Limo.  PIIC stresses that

---

[17] *See* Pl. Bogel Mot. Summ. J., Ex. 41 (providing that Transit is responsible on a triple-net basis to maintain certain licenses and insurance).

[18] *See id.* (providing that Transit is responsible for "auto liability insurance").

16

Transit's name is located nowhere in the endorsement. It further contends that that the federal endorsement applies only to a *registered* motor carrier because federal regulations and the FMCSA Guidance require that the endorsement be issued in the exact name of the motor carrier.[19] Here, Limo is the only federally registered motor carrier.[20] For those reasons, PIIC seeks a declaration providing that MCS-90B applies only to Limo, as a matter of law. It does so because (1) Limo (and not Transit) is the only entity listed on the federal endorsement, and (2) Limo (and not Transit) is the only entity with a federal motor carrier registration number.

Finally, the Settling Parties argue that the judgments to which they consented are valid and enforceable against PIIC. Accordingly, they request a declaration of rights confirming it. PIIC counters that if the Court finds that either the Elite Endorsement or the MCS-90B expose it to liability, the Court cannot grant summary judgment on the Settling Parties' behalf. PIIC contends that genuine issues of material fact exist regarding whether the Agreements were a product of fraud, collusion, or bad faith. According to PIIC, if a jury finds that the Agreements were a product of such misconduct, then PIIC will be entitled, after trial, to a declaration that it is not required to pay the judgments.

## III.  SUMMARY JUDGMENT AND DECLARATORY JUDGMENT STANDARDS

The Settling Parties move for full summary judgment. Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[21] When deciding the motion, the Court must consider

---

[19] *See* 49 C.F.R. § 387.39 (explaining the endorsement and surety bond shall be issued in the exact name of the motor carrier) (emphasis added).

[20] *See* 49 U.S.C.A. § 13906(a) (providing, as one requirement among many, that a motor carrier must register with the Secretary of Transportation).

[21] Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

the evidence of record in the light most favorable to the non-moving party.[22] The initial burden on summary judgment falls upon the moving party.[23] If that party meets his or her initial burden, then the burden shifts to the non-movant to demonstrate a genuine issue of material fact.[24]

By cross-motion, PIIC moves for partial summary judgment on a single issue: that is, whether the MCS-90B covers *Transit*. Partial summary judgment is also available pursuant to Superior Court Civil Rule 56. Through that mechanism, the Court may address individual claims.[25] When considering a motion for partial summary judgment, the Court must consider the evidence of record in the light most favorable to the non-moving party as to the particular issue.[26] The moving party bears the initial burden of proof on that issue.[27] If the movant meets its initial burden, the burden then shifts to the non-moving party to demonstrate the existence of a material issue of fact regarding that issue.[28] At that point, the non-movant must demonstrate material facts in dispute that are sufficient to withstand a motion for a judgment as a matter of law and support the verdict of a reasonable jury regarding the contested claim.[29]

Finally, all parties seek declaratory judgments pursuant to 10 *Del. C.* §§ 6501 and 6502. Those statutes provide the Court the authority to "declare rights."[30] When

---

[22] *Brozaka v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[23] *Moore*, 405 A.2d at 681.
[24] *Id.* (citing *Hurtt v. Goleburn*, 330 A.2d 134 (Del. 1974)).
[25] *See* Super. Ct. Civ. R. 56(a)-(b) (providing that either the claimant or defending party may move for summary judgment as to all issues of a case, or any part thereof).
[26] *Brozaka*, 668 A.2d at 1364 (Del. 1995).
[27] Super. Ct. Civ. R. 56(e); *Moore*, 405 A.2d at 680 (Del. 1979).
[28] *Moore*, 405 A.2d at 681.
[29] *Lum v. Anderson*, 2004 WL 772074, at *2 (Del. Super. Mar. 10, 2004).
[30] *See* 10 *Del. C.* § 6501 (stating "except where the Constitution of this State provides otherwise, courts of record within their respective jurisdictions shall have the power to declare rights, status, and other legal relations . . . and [any] such declaration shall have the force and effect of a final judgment or decree").

an interested person's rights are affected by a contract, that person "may have determined any question of construction or validity arising under [it], and obtain a declaration of rights, status or other legal relations thereunder."[31]

## IV.    ANALYSIS

The Court's coverage analysis turns on the plain language of the policy, the Elite Endorsement that amends the policy, and the MCS-90B that accompanies the policy.    For the reasons discussed below, the Elite Endorsement provides no coverage for Transit or Limo for the loss at issue.    Because the policy's language is unambiguous, the Court need not consider extrinsic evidence and what bearing the parties' competing claims of waiver and estoppel may have on indemnity or defense coverage.

Because the Elite Endorsement does not provide for indemnity or defense coverage, the Court must also examine the MCS-90B endorsement to determine if PIIC has the obligation in this case to perform as a surety for Transit.    The language in the endorsement, when read consistently with the policy, includes Transit as an insured.    In making a coverage decision, however, the Court must also consider the federal regulations that created the MCS-90B, the Delaware statutory law that requires its application in this case, and the guidance of the federal agency that promulgated the regulations that control how it is applied.    After doing so, the Court finds that the MCS-90B includes Transit as an insured as a matter of law.

Finally, because the MCS-90B applies to both Transit as well as Limo, the Court must determine whether the Settling Parties are entitled to a declaration on summary judgment that PIIC must pay the judgments.    To do so, the Court must determine whether there is a genuine issue of material fact regarding Transit's

---

[31] *Id.* § 6502.

19

alleged fraud, collusion, or bad faith.   It must also determine whether a factual issue exists as to PIIC's tortious interference with contract claim. For the reasons discussed below, PIIC demonstrates no genuine issue of *material* fact regarding the defendants' motivations when entering the settlements.  Namely, there is no factual dispute regarding whether the consent judgments were reasonable as to Transit or whether Transit consented to them in good faith.   Summary judgment is also appropriate as to PIIC's tortious interference of contract and fraud claims for the reasons set forth below.

### A. The Elite Endorsement to PIIC's policy does not expand the definition of an insured to provide coverage for Limo, Transit, or Transportation.

PIIC's commercial business auto policy provides indemnity and defense coverage for scheduled vehicles only.  The schedule did not include the van, or the trailer involved in the accident.  The first issue on summary judgment is whether the Elite Endorsement extends coverage to one or more of the defendants for this accident involving non-scheduled vehicles.

The Elite Endorsement provides "coverage extensions" if there is no other specific coverage provided under the Policy.[32]  Relevant to the Settling Parties' contentions, the endorsement extends coverage, in part, by expanding the definition of who is an insured to include a "Lessor of Leased Autos."[33]

During the pendency of the summary judgment motions, the parties advanced various interpretations of the Elite Endorsement and how those interpretations apply to the facts of the case.  They cited no case law to support their respective positions regarding this endorsement.

---

[32] Pl. Gigler Resp., Ex. O, at 70-76.
[33] *Id.* at 71.

Nevertheless, the standard for interpreting insurance contracts is well-recognized. Namely, policies must be construed as a whole to comply with the intent of the parties.[34] Endorsements to a policy must be read together with the policy as one document. They become part of the contract to the same extent as if they were embodied within it.[35] When policy language is unambiguous, Delaware courts apply the ordinary and usual meaning of the language.[36] As the Delaware Supreme Court has repeatedly held, Delaware courts are not free to deviate from the words of a clear and unambiguous insurance contract.[37]

Here, the Elite Endorsement provides that the lessor of a leased auto becomes an insured under certain circumstances. In this case, Transportation leased the vehicles to Transit. The Settling Parties initially argued that the provision somehow provided coverage to Transit, the lessee of the vehicle. At the conclusion of the briefing, they adjusted their arguments to assert that *Transportation* became an additional insured as the lessor of the van and trailer.

The Elite Endorsement's plain language supports neither interpretation. Namely, it includes the "lessor of a leased auto" as an additional insured. Accordingly, Transit has no indemnity coverage under the policy because it was the lessee. Furthermore, there is no reasonable reading of the endorsement that includes non-scheduled vehicles as covered entities under the policy in any event. Namely, the Elite Endorsement's definition of a "leased auto" for purposes of coverage extension is expressly limited to a "'leased auto[s]' *in the policy schedule*."[38]

---

[34] *In re Solerna Coverage Appeal*, 240 A.3d 1121, 1131 (Del. 2020) (citations omitted).

[35] *See Intel Corp. v. Am. Guarantee & Liability Ins. Co.*, 51 A.3d 442 (Del. 2012) (interpreting an insurance contract and a series of endorsements as a whole); Steven Plitt, et al., *Riders and Endorsements*, 2 Couch on Ins. § 18:19 (3d ed. 2021) (explaining that an endorsement is part of an insurance contract and must be treated as if it was embedded in it).

[36] *In re Solerna*, 240 A.3d at 1131.

[37] *Hallowell v. State Farm Mut. Auto. Ins*. Co., 443 A.2d 925, 926 (Del. 1982).

[38] Pl. Gigler Resp., Ex. O, at 71, ℙ 4(c) (emphasis added).

Because the policy never listed the van and trailer in the schedule, there is no coverage extension for Transit, Limo, or Transportation.

The parties disagreed as to how, if at all, the Elite Endorsement extends coverage for leased automobiles. The Court need not resolve that issue here. The common and ordinary meaning of the language contained in the endorsement preserves the policy's restriction on coverage to only vehicles listed in the policy's schedule. Moreover, because the Elite Endorsement's language is clear and unambiguous, the Court need not address PIIC's contention that the defendants waived their right to seek coverage under the policy because they failed to place PIIC on notice of such a claim before the summary judgment briefing stage.

### B. The MCS-90B endorsement requires PIIC to pay lawful judgments entered against Transit.

PIIC requests a declaration that the MCS-90B endorsement applies solely to Limo as a matter of law. By cross-motion, the Settling Parties request an opposing declaration that clarifies that the MCS-90B endorsement also applies to Transit. Accordingly, a central issue in this suit is whether the MCS-90B's reference to "insured," which specifies what entities are covered by the MCS-90B, means (1) the *named insureds in the policy* or only (2) the *entity listed on the blank line on the endorsement.*

In 1980, Congress passed the Motor Carrier Act ("MCA").[39] The MCA was enacted, in part, to remedy abuses in the interstate trucking industry that threatened public safety. Such abuses included carriers' uses of leased or borrowed vehicles to avoid financial responsibility when they transported goods or persons in interstate

---

[39] *See generally* Motor Carrier Act of 1980, 49 U.S.C. § 10101 (1980) (providing statutory provisions for the oversight of interstate motor carriers).

commerce.[40]  The MCA and accompanying regulations require all interstate motor carriers (of passengers and property) to file "a bond insurance policy or other type of security" as determined by the Secretary of Transportation.[41]  Among many requirements, the MCA provides that a commercial motor carrier must register *and* must be willing and able to comply with the Act's  minimum financial responsibility requirements.[42]

A motor carrier of passengers may establish proof of the requisite financial responsibility in one of three ways: (1) by procuring an MCS-90B endorsement, (2) by a surety bond, or (3) by self-insurance.[43]  Motor carriers that transport sixteen or more passengers must provide proof of minimum financial responsibility in the amount of $5 million.[44]

The federal statutes and regulations apply only to interstate transportation.[45] Nevertheless, the Delaware General Assembly expanded the scope of this protection in Delaware to include intrastate trips.[46]  It did so by first legislatively incorporating the federal regulations that implemented the Act.[47]  When doing so, the General Assembly separately required that any "vehicle [for hire] having a seating capacity

---

[40] *Canal Ins. Co. v. Distrib. Servs., Inc.,* 320 F.3d 488, 489 (4th Cir. 2003).

[41] *Forkwar v. Progressive Nat'l Ins. Co.,* 910 F.Supp.2d 815, 824 (D. Md. 2012). *See Canal*, 320 F.3d at 489 (explaining the Secretary of Transportation's authority to "prescribe the appropriate form of endorsement required for coverage").

[42] *Carolina Cas.*, 584 F.3d at 874 (emphasis added).

[43] *Canal*, 320 F.3d at 489.

[44] 49 U.S.C.A. § 31138.

[45] *See id.* § 31139 (applying the minimum financial responsibility requirements to interstate and foreign commerce); 49 C.F.R. § 387.3(b) (providing that the requirements do not apply to intrastate commerce unless the motor carrier transports hazardous materials, substances, or wastes). *See also Lyles v. FTL LTD., Inc.,* 339 F.Supp.3d 570, 575-76 (S.D.W.V. 2018) (discussing the "trip-specific" approach federal courts have taken with respect to the MCS-90 endorsement and noting that the requirements do not apply to intrastate commerce except as provided in § 387.3(b)).

[46] 21 *Del. C.* § 4702.

[47] *See id.* (adopting two-thirds of the relevant sections of the Federal Motor Carrier Safety Regulations and applying the minimum financial requirements regardless of whether the trip is interstate or intrastate).

of 16 or more persons" must comply with the federal regulations.[48]   It follows that Transit qualifies as a motor carrier under Delaware law because it complies with both the state and federal definitions.

In addition, the General Assembly expanded the application of the FMCSA regulations to all *intrastate* trips.[49]   Accordingly, although the Jolly Trolley accident occurred on an intrastate trip, the MCA's minimum financial requirements apply to any motor carrier involved in the trip.    Because the General Assembly incorporated the federal regulations into the Delaware Code, Transit must meet the $5 million minimum financial responsibility requirements of the MCA for this accident.[50] Therefore, if the MCS-90B covers Transit, then PIIC must pay any lawful judgment, up to $5 million, that a court enters against Transit.

At the outset, if the MCS-90B is to be interpreted as would any other endorsement to a policy, Transit is a covered entity under the MCS-90B.  Namely, the MCS-90B provides that PIIC must satisfy judgments entered against its "insured."   The MCS-90B further provides that "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company."[51]   The policy specifically names Transit as one of its two named insureds.[52]  Simply substituting "Transit" and "Limo" for the term insured as included in the MCS-90B would end the analysis -- Transit would be covered.   In other words, if the Court interprets the

---

[48] *Id.* § 4702(b)(2).

[49] *Id.* § 4703 (emphasis added).

[50] *Id.*  Both PIIC and the Settling Parties concede that Delaware statutes require the Court to apply the relevant portions of the Federal Motor Carrier Safety Regulations in this case.  The MCS-90B satisfies both federal and Delaware law based upon incorporation of the regulations by Delaware statute and because 21 *Del. C.* § 4703 applies the requirements to intrastate as well as interstate trips.

[51] Pl. Gigler Resp., Ex. O, at 68.

[52] *Id.* at 12.

24

MCS-90B as it would any other endorsement, PIIC would have to perform as a surety for Transit.

On one hand, unlike other endorsements, PIIC did not draft the MCS-90B. PIIC has a strong argument that because the form of the MCS-90B is stamped upon the policy by law, it should be read independently from the policy. On the other hand, PIIC sold the policy to Limo and Transit knowing that the MCS-90B was included and should have anticipated the issue and that it assumed the risk when issuing a commercial policy to two entities that qualified as motor carriers. PIIC realized this exposure, at least after the fact, when it acknowledged in its January 2019 letter that both Limo and Transit potentially fell within the scope of the MCS-90B.

While the plain language of the MCS-90B obligates PIIC to act as a surety for Transit, the Court must nevertheless examine controlling federal law when interpreting it. The federal endorsement has been described as a "a creature of federal law" because its language is prescribed by federal regulation.[53] The FMCSA promulgated the form, published it, and prohibits changing it. As a result, the Court appropriately looks to the regulations that provide for the MCS-90B when the Court determines its scope.

For years, state and federal courts interpreted the federal endorsement inconsistently. Both the MCS-90 and the MCS-90B are controlled by parallel regulations that are identical for all relevant purposes in this suit. The term "insured," as used in both endorsements, created significant confusion in application, although in contexts different than in the case at hand. These inconsistent interpretations prompted requests from the industry for additional rulemaking. In response, the FMCSA provided regulatory guidance (the

---

[53] *Armstrong v. U.S. Fire Ins. Co.,* 606 F.Supp.2d 794, 820 (E.D. Tenn. 2009).

"Guidance") for several of the forms used to establish the "Minimum Levels of Financial Responsibility of Motor Carriers" as required by 49 U.S.C. § 31138.[54]

The FMCSA issued this interpretive Guidance for Forms MCS-90, MCS-90B, MCS-82, and MCS-82B in 2005. It did so, in large part, to address the meaning of the term "insured" in the endorsements.[55] Relevant to the MCS-90B, the Guidance provided:

> Question 4: Does the term "insured," as used on Form MCS-90B . . . mean the motor carrier named in the endorsement or surety bond?
>
> Guidance: Yes, under 49 CFR 387.29, "insured and principal" is defined as the "motor carrier in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier. Form MCS-90B [is] not intended . . . to require a motor carrier's insurer . . . to satisfy a judgment against any party other than the carrier named in the endorsement . . .[56]

Both parties contend that the FMCSA guidance supports their respective positions. The above-mentioned Guidance may be helpful in many cases, but the Jolly Trolley incident threads the needle of application sufficiently to highlight an area of ambiguity in the *Guidance*. Nevertheless, as discussed below, the regulations control over the Guidance. They contain no such ambiguity.

As to the Guidance, PIIC highlights the portion that provides that the endorsement is intended to satisfy only a judgment against *the carrier named in the endorsement*. PIIC argues that only Limo qualifies because it is the only entity specifically referenced in the endorsement.

---

[54] 70 F.R. 58065-01.
[55] *Id.*
[56] *Id.*

The Settling Parties counter that the endorsement's language provides that it amends the policy.[57] As such, they argue that the federal endorsement's inclusion of the word "insured" should be read consistently with the policy. Both Limo and Transit are named insureds under the policy. Also, the Settling Parties stress that the Guidance quotes the controlling federal regulation. Unlike the balance of the Guidance, that regulation defines the motor carrier listed *in the policy of insurance* as the motor carrier covered by the endorsement. Finally, the Settling Parties contend that Transit and Limo are both motor carriers.[58]

The Guidance followed a split of authority regarding whether the federal endorsements required an insurance company to pay a judgment entered against a permissive user who was *not* a named insured in the policy.[59] Contrary to the circumstances examined in those cases, Transit was a named insured.

The Guidance incorporated 49 C.F.R. § 387.29's definition of insured when explaining that permissive users were not included as insureds in the MCS-90B. In

---

[57] *See* Pl. Gigler Resp., Ex. O, at 68 (providing that "[t]he insurance policy to which this [MCS-90B] is attached provides automobile liability insurance . . ." and further that "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company").

[58] Motor carrier is defined in the federal regulations as a "for-hire" motor carrier, meaning "[a] person who engages in the transportation of goods or passengers for compensation" and includes an agent, officer, or representative of the motor carrier." 49 C.F.R. § 387.5. Likewise, pursuant to 21 *Del. C.* § 4702, Transit fits the definition of a motor carrier. There is nothing in the regulations or the language of the MCS-90B that make PIIC's obligation to pay a judgment rendered against a motor carrier named in the policy of insurance contingent upon that motor carrier's registration with the Secretary of Transportation.

[59] *See* William J. Schermer & Irvin E. Schermer, *Motor Carrier Financial Responsibility – The MCS-90 endorsement*, 1 Auto. Liability Ins. 4th § 2:14 (describing the majority position as holding that the MCS-90 requires the payment of judgments against the motor carrier only and does not obligate the insurer to pay a judgment against the driver or other permissive users) (emphasis added); *but cf. John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 860 (9th Cir. 2000) (holding the insurer was required to indemnify because the definition of "insured" encompasses permissive users as well as the named insured); *Adams v. Royal Indemn. Co.*, 99 F.3d 964, 971 (10th Cir. 1996) (holding the MCS-90 endorsement voided a limitation on the definition of insured to include a permissive user, eliminating the requirement that the auto be specifically listed on the policy).

27

the Jolly Trolley matter, the Court must turn directly to the regulations to resolve the case at hand.   When doing so, the regulatory definition of "insured" must be read into the MCS-90B endorsement created by the same regulatory scheme. Namely, the regulation provides:

> Insured and principal means the motor-carrier named *in the policy of insurance*, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier.[60]

Here, Transit qualifies as an insured pursuant to the definition of insured contained in the same regulatory scheme that created the endorsement.   To not use the regulation's definition of insured when interpreting the meaning of insured as employed in the endorsement would be illogical.   It would also contradict the very regulations that created the endorsement.

Furthermore, Transit meets the federal regulatory definition of motor carrier in that it acted as a "for-hire motor carrier" of more than fifteen passengers.[61] Pursuant to Delaware law, Transit separately qualifies as a motor carrier because it carried more than fifteen passengers for hire.[62]

PIIC's argues that because Limo had the only federally issued motor carrier registration number, Limo qualified as the only "motor carrier."   Thus, PIIC contends that Transit did not fit within the Guidance's description of who was an insured.   Such an interpretation disregards the plain language in the regulations.   To accept PIIC's position, the Court would have to disregard the clear definition of motor carrier: that is, a for-hire carrier that carries more than fifteen passengers.[63]

---

[60] 49 C.F.R. § 387.29 (emphasis added).

[61] *See id.* § 387.27(b)(3) (providing that the regulations apply to for-hire motor carriers transporting more than fifteen persons).

[62] 21 *Del. C.* §§ 4702 & 4703 (for purposes of Delaware, including intrastate within all relevant FMCSA regulations).

[63] *See Herrod v. Wilshire Ins. Co.*, 499 Fed. Appx. 753, 759 (10th Cir. 2010) (recognizing that the definition of motor carrier makes the motor carrier, *not* the act of registration).

In the briefing and at argument, the parties heatedly disputed whether Transit was free to use the registration number issued to Limo. The Settling Parties cited agency guidance that supported that Transit could lawfully use Limo's registration number.[64] PIIC disputes that. In any event, the Court need not resolve that issue. Even if the Court assumes that Transit had to separately register as a motor carrier, its potential failure to do so did not absolve it of its motor carrier status. Accordingly, because it carried thirty-one passengers for hire, it had to separately meet the MCA's minimum financial responsibility requirements. Namely, "[i]t is well established that the primary purpose of the MCS-90 is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate [and in Delaware, intrastate] carriers."[65] That Transit did not secure its own registration number did not affect Transit's (1) obligation to meet the minimum financial requirements or its (2) ability to contract with PIIC to provide innocent members of the public the protection required by the MSA.

The parties relied upon the same cases when arguing their positions. The decisions they cite are all post-2005 decisions that followed the Guidance. Neither party could identify, nor could the Court find, a single federal or state decision that addressed the specific issue presented in this case. A summary of the decisions they cite recognizes three consistent themes: (1) the named insureds in the policy of insurance *are* covered by the MCS-90B; (2) permissive users *who are not named* in the insurance policy are not covered; and (3) independent contractors that own a tractor, who are not named insureds in the policy issued to the trailer owners, are not covered by the trailer owner's MCS-90Bs. In other words, the cases stand for the

---

[64] *See* Pl. Bogel Rep. Br. at 15 (showing the FMCSA's affirmative answer that a motor carrier can operate under another's motor carrier number).
[65] *Canal*, 320 F.3d at 489 (quoting *Nueva,* 229 F.3d at 857).

29

proposition that the MCS-90 did not cover the defendants in categories (2) and (3) *only because those defendants were not named insureds in the policy of insurance*.

As an example, the first decision the parties contend supports their respective positions is the Eastern District of Tennessee decision in *Armstrong v. United States Fire Insurance Company*.[66] In *Armstrong*, the parties sought a declaration regarding whether the MCS-90 applied to two defendants that were not named insureds in the policy. The defendants leased a vehicle from another business. The other business was the sole named insured on its own policy that included an MCS-90.[67]

When considering the issue, the *Armstrong* court recognized two basic approaches to interpreting the MCS-90.[68] One approach was to interpret it as "any other policy endorsement and determine its meaning based on the context of other policy provisions, applying the usual rules for the interpretation of insurance contracts."[69] In that instance, permissive users who were not named insureds would nevertheless fall within the definition of "insured" under general principles of construction.

The *Armstrong* court opted for a second approach to interpret the MCS-90, however. Namely, it interpreted the MCS-90 based upon the regulatory scheme provided by the FMCSA and identified it as the majority approach when doing so.[70] When the court examined the regulations and the Guidance, it held that the that lessees of a named insured were not "insureds" for the purpose of the MCS-90 endorsement.[71] After reaching that conclusion, the *Armstrong* court held that "the

---

[66] 606 F.Supp.2d 794 (E.D. Tenn. 2009).
[67] *Id.* at 797.
[68] *Id.* at 820.
[69] *Id.*
[70] *Id.*
[71] *Id.* at 823.

only sensible reading and interpretation of the MCS-90 is that 'the insured' is the named insured, *i.e.,* "the motor carrier named in the policy of insurance."[72]

In other words, the *Armstrong* court declined to extend coverage to the entity leasing the vehicle because, as the lessee, it was not named in the policy of insurance. That makes good policy sense because the lessee, who was not a named insured, would not be bound to "reimburse the [insurance] company" for monies paid toward the judgment by the insurance company. To hold otherwise would defeat the insurance company's right as a surety to recoup payments from its named insureds. For that reason, the *Armstrong* court recognized that "it could not reasonably be argued that 'insured' referred to anyone other than a named insured" under the insurance policy itself.[73]

As in the *Armstrong* decision, the other decisions cited by the parties turn on a distinction not found in Jolly Trolley's circumstances. By way of further example, the United States District Court for the District of Minnesota decided similarly in *Great West Casualty Co. v. General Casualty Co. of Wisconsin.*[74] There, the court examined whether a negligent owner-operator of a tractor that hauled another company's trailer qualified as an insured under the *trailer owner's* MCS-90 endorsement. There, the MCS-90 attached to a policy purchased by the trailer owner. The policy issued in that case did not include the owner-operator of the tractor as an insured.[75] As a result, that tractor owner had no coverage under the MCS-90.[76]

---

[72] *Id.*

[73] *See id.* at 825 (stating "only a party to the insurance contract could affect cancellation and it would be nonsensical to suggest that [defendants] have any right to cancel the policy").

[74] 734 F.Supp.2d 718 (D. Minn. 2010).

[75] *Id.* at 743.

[76] *Id.*

Likewise, the parties cite the United States District Court for the Eastern District of Virginia decision in *Sentry Select Ins. Co. v. Thompson*[77] for similar competing positions. There, the district court likewise held that the MCS-90 required payment for the named insured only.[78] When so holding, the court declined to find that the non-employee driver and owner of the tractor was an insured for MCS-90B purposes. There, the endorsement attached to a policy that the insurer had issued to the *trailer* owner only.[79] Accordingly, the *Sentry* decision also echoes the consistent theme that neither the MCS-90 nor the MCS-90B applies to entities who are not named in the policy of insurance to which the federal endorsement is attached.[80] In this way, these cases support the holding that Transit is an insured for purposes of the MCS-90B.[81]

Finally, because the MCS-90B imposes a suretyship obligation upon PIIC as to Limo and Transit, the question arises as to how much of the remaining combined Bogel plaintiff judgments PIIC must pay if the judgments are enforceable. In deciding this issue, the Court first notes the purpose behind the federal requirement for the endorsement. Namely, its purpose is to protect the public and to provide a

---

[77] 665 F.Supp.2d 561 (E.D. Va. 2009).

[78] *Id.* at 569.

[79] *Id.*

[80] *See Daniel v. Nat'l Cas. Ins. Co.*, 135 F.Supp.3d 355, 368 (D. Md. 2015) (noting "[f]ederal courts have been virtually unanimous in holding that the MCS-90 endorsement provides coverage only to the named insured"); *Ill. Nat'l Ins. Co. v. Temain*, 779 F.Supp.2d 921, 927 (N.D. Ind. 2011) (explaining that "[c]ourts addressing the meaning of 'insured' in the MCS-90 endorsement . . . have consistently held the endorsement's coverage does not extend beyond the named insured" in the policy); *Armstrong*, 606 F.Supp.2d at 820-25 (concluding that "[a]s an initial matter, the language of the statute supports the interpretation that 'the insured' in the MCS-90 refers to the motor carrier named in the policy of insurance").

[81] The Settling Parties allege that PIIC waived its right to deny coverage under the MCS-90B because PIIC did not issue a reservation of rights letter until January 2019, in the middle of Part I of this litigation. Because the plain language of the endorsement and the federal regulations control, the Court need not address the issue of whether PIIC should be estopped from denying its suretyship obligation. The MCS-90B applies to both Limo and Transit and imposes a suretyship obligation upon PIIC, as to both, for up to five million dollars.

mechanism to pay judgments against motor carriers for the benefit of the public.[82] To fulfill this obligation, the endorsement provides two options. Here, the parties selected the first option with an X that provides: "[t]his insurance is primary and the company *shall not be liable for amounts in excess of $5,000,000 for each accident*."[83] In addition to this selected option, the MCS-90B provides elsewhere that "the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment received against the insured."[84]

The selected option on the MCS-90B differs from the one the parties declined to select. Namely, the endorsement contains a second option to elect the insurance as only excess, with the ability to identify other coverages that would partially offset PIIC's obligation to pay.[85] Given the option selected, the endorsement in this case unambiguously provides that PIIC must pay up to $5 million until valid judgments against Transit are satisfied.

### C. There is no genuine issue of material fact regarding the reasonableness of the settlement amount or regarding Transit's fraud, collusion, or bad faith.

PIIC contends in its amended petition for intervention that the Agreements were a product of fraud, collusion, or bad faith. As a result, it asserts that it need not pay the remaining amounts due on the judgments entered on behalf of the Bogel

---

[82] *Nueva*, 229 F.3d at 857 (citing *Harco Nat. Ins. Co. v. Bobac Trucking, Inc.*, 107 F.3d 733, 736 (9th Cir. 1997)).

[83] Pl. Gigler Resp., Ex. O, at 68 (emphasis added).

[84] *Id. See also Herrod v. Wilshire Ins. Co.*, 737 F.Supp.2d 1312, 1318 (D. Utah 2010), *aff'd in part*, 499 Fed. Appx. 753 (10th Cir. 2010) (recognizing that pursuant to the MSA and federal regulations, the motor carrier is required to pay up to the coverage amount when needed to satisfy a judgment).

[85] *See* Pl. Gigler Resp., Ex. O, at 68 (providing "[t]his insurance is excess, and the company shall not be liable for amounts in excess of $____ for each accident in excess of the underlying limit of $ ____ for each accident").

33

plaintiffs. The Settling Parties move for summary judgment and allege that there are no factual issues regarding the reasonableness of the Agreements or the Settling Parties' lack of fraudulent intent, collusive behavior, or bad faith. PIIC responds that issues of fact remain as to the Settling Parties' motivations when they entered the Agreements.

For the reasons discussed below, the proper lens with which to view this issue for summary judgment purposes is through the eyes of Transit. Transit's potential liability and the extent of its exposure constitute the only material issues. Limo or the Hastings' separate motivations for consenting to the entry of judgments against themselves may be subject to a factual dispute. Those motivations, however, do not constitute *material* issues of fact because the MCS90-B covers Transit as an insured. Because Transit is jointly and severally liable with the other defendants (including Limo) for the same combined judgments, if Transit participated in a reasonable settlement as to Transit, the other issues become moot.

When evaluating the propriety of the Agreements, the Court recognizes that both parties are placed in a difficult position when an insurer and an insured dispute coverage.[86] On the insurer's part, if it chooses to defend the insured, it may be unable to assert a policy defense or coverage exclusion under the policy.[87] On the other hand, depending on the outcome of the case, a non-participating insurance company

---

[86] *See* Steven Plitt & Jordan R. Plitt, *Consent settlements*, 1 Prac. Tools for Handling Ins. Cases § 7:37 (2021) (explaining the common basis for disputes among insurance companies and the insureds in relation to potential insurance claims).

[87] *See Am. General Fire & Cas. Co. v. Progressive Cas. Co.*, 799 P.2d 1113, 1117 (N.M. 1990) (recognizing that in many cases "a liability insurance carrier that assumes the defense in an action against its insured is precluded from later asserting that no coverage exists"); *see also Pendleton v. Pan Am. Fire & Cas. Co.*, 317 F.2d 96, 99 (10th Cir. 1963) (concluding "[t]he insurer's unconditional defense of an action brought against its insured constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert the defense of noncoverage"); *Consent settlements,* 1 Prac. Tools § 7:37.

runs the risk of being responsible for a judgment entered by consent without its permission.[88]

As a general rule, when an insurer wrongfully refuses to defend a claim, "the insured may enter into a reasonable settlement with the claimant, absent fraud, collusion, or bad faith, and sue the insurer for indemnity [here, in suretyship] for the amount paid in settlement."[89] Courts have recognized that "an insured who has been expose[d] . . . to the sharp thrust of personal liability" by an insurer's breach of its obligations "need not indulge in financial masochism . . .."[90] Instead, the insured is free to enter the best possible settlement under the circumstances so long as the insured does so within the bounds of reason.[91] Pursuant to an assignment of rights, the injured plaintiffs in this matter likewise acquired the right to protect their interests through this litigation with PIIC.

A protective mechanism available to insureds who contest an insurer's denial of coverage includes stipulating or consenting to a judgment in favor of the injured party and coupling that with the injured party's covenant not to execute against the insureds.[92] Courts find this mechanism enforceable under certain circumstances.[93] In fact, many courts have found such consent judgments, coupled with agreements

---

[88] *Consent settlements*, 1 Prac. Tools § 7:37.

[89] *See* Stephen R. Schmidt, *The Bad Faith Setup*, 29 Tort & Ins. L. J. 705, 723 (1994) (noting "[a]n insured must be allowed to consider all available options-particularly if the possibility exists that the insurer will be absolved from providing coverage").

[90] *Cont'l Cas. Co. v. Hempel,* 4 Fed. Appx. 703, 716 (10th Cir. 2001) (quoting *Samson v. Transamerica*, 636 P.2d 32, 45 (Cal. 1981)).

[91] *Id.*

[92] *Id*. The defendants' assignment of rights to the plaintiffs, to prosecute the claims against the insurers, also frequently accompanies this. The defendants made such assignments in this case.

[93] *See The Bad Faith Setup*, 29 Tort & Ins. L. J. at 722 (citing cases holding that a covenant not to execute given to the insured in connection with a consent judgment does not affect responsibility under the policy); *Freeman v. Schmidt Real Estate & Ins., Inc.*, 755 F.2d 135, 137 (8th Cir. 1985) (noting that "[a] covenant not to execute is merely a contract . . . and the insurer still must make good on its contractual promise to pay"). *See also Miller v. Shugart*, 316 N.W.2d 729, 732-34 (Minn. 1982) (holding that "the insureds did not breach their duty to cooperate with the insurer, which was then contesting coverage, by settling directly with the plaintiff").

not to execute, to be presumptively enforceable.[94]  Accordingly, it is the insurer that contests liability that bears the burden to show the agreement was the product of fraud, collusion, or bad faith.   Balanced against such a presumption, however, are the courts' consistent recognitions that such consent judgments have the potential for fraud or collusion because the insured may have little incentive to contest liability or damages.[95]

The relevant inquiry regarding enforceability of judgments against non-participating insurers turns simply on whether it is fair to do so.  Courts have described the standard for ensuring fairness to a non-participating insurer in different ways.   Many refer to it in the shorthand as simply determining whether the settling parties did so with "collusion."  Other courts have examined it in terms of discrete issues, while recognizing that the test for fraud and collusion are defined broadly and "are not necessarily tantamount to the tort of fraud in that there need not be a misrepresentation of a material fact."[96]

The black letter standard asks whether the consent judgment was tainted by fraud, collusion, or bad faith.[97]  Courts often conflate the three terms and examine them with one lens.  A good summary of the standard is as follows:

> [c]ollusion and fraud [and bad faith] in this context are not necessarily tantamount to the common-law tort of fraud in that there need not be a misrepresentation of material fact.  Any negotiated settlement involves cooperation to a degree.  It becomes collusive when the purpose is to injure the interest of an absent or nonparticipating party, such as an insurer or non-settling defendant.  Among the indicators of bad faith and collusion are unreasonableness, concealment, secretiveness, lack of

---

[94] *See The Bad Faith Setup*, 29 Tort & Ins. L. J. at 722 (citing cases holding consent judgments as presumptively enforceable); *see also Consent settlements*, 1 Prac. Tools § 7:37 (recognizing the general assumption that absent contrary evidence, persons are presumed to act fairly, honestly, and in good faith).

[95] *Hempel,* 4 Fed. Appx. at 717 (quoting *Prynn v. Agricultural Ins. Co.,* 500 Cal.Rptr.3d 305-08 (Cal.2d Dist. Ct. App. 1995)).

[96] *Id.*

[97] *Id.*

serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer. They have in common, unfairness to the insurer, which is probably the bottom line in cases in which collusion is found.[98]

The Supreme Court of Minnesota's decision in *Miller v. Shugart*[99] is a seminal decision regarding how to examine the propriety of such agreements. There, the court recognized the general proposition that a money judgment confessed to by an insured is not binding on an insurer if obtained through fraud or collusion.[100] When reviewing the trial court's decision to grant summary judgment on behalf of the settling parties, the Minnesota high court first considered the difficulties imposed upon an insurer in such circumstances. Namely, it recognized that an insurer that contests coverage can participate in settlement discussions.[101] If it does, it runs the risk of abandoning policy defenses.[102] On the other hand, the insurer contesting coverage can refuse to participate in settlement negotiations. That creates the separate risk of binding the insurer to a settlement agreement absent its participation.[103] After considering the difficulties faced by insurers in these situations, the court in *Miller* opted to place the greater burden of risk upon the insurers rather than the insureds.[104]

After discussing these tensions, the Minnesota Supreme Court conducted a two-part inquiry to evaluate the fairness of enforcing the settlement upon the insurer. In the context of an appeal of a summary judgment decision, it first examined whether the record contained a factual issue regarding fraud or collusion.[105] It found

---

[98] *Consent settlements*, 1 Prac. Tools § 7:37 (citations omitted).
[99] 316 N.W.2d 729 (Minn. 1982).
[100] *Id.* at 734.
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *Id.*

that the record did not create a factual issue regarding the settling parties' improper motivations.[106]  Second, the court moved to the question of whether the settlement was reasonable and prudent.  There, the Court held on the summary judgment record that it was reasonable.[107]  As a result, the Minnesota Supreme Court upheld the trial court's granting of summary judgment on behalf of the settling parties.[108]

Many other jurisdictions have adopted this two-part standard.[109]  The Delaware Supreme Court, however, has yet to address the issue.  The only Delaware decision that has addressed a similar issue is the Superior Court decision in *Montgomery v. William Moore Agency*.[110]

In the *Montgomery* decision, the court examined the enforceability of a stipulation, assignment of claims, and covenant not to execute against a defendant that did not participate in settlement negotiations.[111]  There, as is the case with PIIC, the defendant's rights were directly impacted by the settlement.[112]  Namely, the parties to the underlying action had stipulated to liability, causation, and agency, and the only issue left before an arbitrator was damages.[113]  In exchange for an agreement to arbitrate a matter that could bind the non-participating defendant, the claimant agreed not to execute or otherwise collect the judgment from the other defendants

---

[106] *Id.*

[107] *Id.* at 735.

[108] *Id.* at 736.

[109] *See Ayers v. C & D General Contractors et al.*, 269 F.Supp.2d 911, 917 (W.D. Ky. 2003) (opting to apply the two-part inquiry because it more evenly divides the burden of proof between the parties); *Griggs v. Bertram,* 443 A.2d 163, 173-74 (N.J. 1982) (holding that an insured has the initial burden of producing evidence that the settlement is *prima facie* reasonable in amount and untainted by bad faith and if met, the burden of persuasion is shifted to the insurer); *Glenn v. Fleming*, 799 P.2d 79, 93 (Kan. 1990) (endorsing the two-part inquiry); *Steil v. Florida Physicians' Ins. Reciprocal*, 448 So.2d 589, 592 (Fla. 2d 1984) (holding that a settlement may not be enforced against the carrier if it is unreasonable in amount or tainted by bad faith, and adopting the two-part inquiry).

[110] 2016 WL 1613308, at *1 (Del. Super. Mar. 31, 2016).

[111] *Id.*

[112] *Id.* at *2.

[113] *Id.* at *1.

beyond the available insurance coverage.[114] To complete that agreement, the parties agreed to vacate a previous summary judgment decision in favor of the insured.[115] The non-participating defendant then moved for summary judgment on the issue of alleged collusiveness. When doing so, the non-participating defendant claimed that the settling parties' collusion made the settlement unenforceable against it.[116]

In that case, the parties stipulated to burden of proof issues and the applicable standard. The court in *Montgomery*, without further analysis, agreed to apply that standard.[117] That standard was identical to the two-stepped approach used in the *Miller* decision, though it applied the two questions in the opposite order. Namely, the court in *Montgomery* examined reasonableness before it addressed the question of collusion. When doing so, it held that when a non-participating party raises an issue of fraud or collusion in a settlement, the settling parties bear the initial burden of producing evidence to establish that the agreement was *prima face* reasonable.[118] Next, if the settling parties demonstrate that the settlement and its amount were reasonable, the burden shifts to the insurer to show by a preponderance of the evidence that it is not liable because the settlement is "neither reasonable nor reached in good faith."[119]

Unlike in the case before the Court today, in *Montgomery*, the settling parties did not seek summary judgment. They merely opposed summary judgment. The burden shifting described by the court set a reasonable standard for the trier of fact.

---

[114] *Id.*

[115] *Id.* at *4. The *Montgomery* court also noted that the defendants continued to face liability regardless of the summary judgment decision due to the possibility that it would be reversed on appeal.

[116] *Id.* at *2.

[117] The parties in this case have likewise stipulated to this two-part inquiry, in the order suggested by the *Montgomery* decision.

[118] *Montgomery*, 2016 WL 1613308, at *4.

[119] *Id.*

On balance, addressing reasonableness before collusion seems to be a logical order and the burden shifting from the first issue to the second is also appropriate.

For purposes of summary judgment, however, the Court need not wrap its summary judgment analysis within the burden shifting framework agreed to in the *Montgomery* decision. Namely, to win on summary judgment, the Settling Parties must meet their initial burden as to both inquires: (1) the reasonableness of the agreement; and (2) lack of fraud, collusion, or bad faith. Upon such a showing, for summary judgment purposes, the burden then shifts to PIIC to identify a genuine issue of material fact regarding either.

Accordingly, as to the Jolly Trolley Agreements, the Court must first determine whether the Settling Parties meet their initial burden on summary judgment by showing that the parties' settlement was *prima facie* reasonable and prudent.[120] The benchmark for this inquiry is "what a reasonably prudent person in the position of the defendant would have settled for on the merits of the plaintiff's claim."[121]

First, to assess the reasonableness of Transit's consent to judgment, the Court must consider facts relevant to the liability and damages aspects of the plaintiffs' claims and then assess the risk that Transit faced had it gone to trial.[122] Relevant factors to consider include: (1) the merits of the releasing party's theory of liability, (2) the merits of the released party's defense theory and relative fault, (3) the risk and expenses of continued litigation, (4) the extent of the released person's ability

---

[120] *Id.*
[121] *Miller*, 316 N.W.2d at 735.
[122] *Id*.

40

to pay, and (5) the extent of investigation and preparation of the case, as well as the interests of the parties not being released.[123]

This analysis is admittedly complex. In fact, it creates such a complex factual issue that some jurisdictions have held that issues of reasonableness should be tried only to a court, and not to a jury.[124] The Settling Parties argue that the Court should decide all such matters in all cases. No Delaware authority supports the Court's appropriation of the jury's role, however, regardless of the matter's complexity. As a result, notwithstanding the complexity of the issues and that a trial on these issues would inevitably require a trial within a trial, summary judgment remains appropriate only when no genuine issues of material fact exist.[125]

Here, the Court views the evidence in the light most favorable to PIIC as the non-moving party on both inquires. First, as to the reasonableness of the settlement amount, the Settling Parties make a *prima facie* showing that the decision to settle the claims against Transit was reasonable. Because the Court entered judgment jointly and severally against all defendants, the only defendant's decision to settle that constitutes a *material* fact is Transit's decision to consent to judgment. Transit's conduct was undisputedly negligent, was probably reckless, and caused significant injuries to the plaintiffs.

In this regard, the Settling Parties meet their initial burden on summary judgment by demonstrating that the $6.1 million in combined consent judgments

---

[123] *See Midwestern Indem. Co. v. Lakin,* 119 F.Supp.2d 831, 843-44 (S.D. Ind. 2000) (quoting *Associated Wholesale Grocers, Inc. v. Americold Corp.,* 934 P.2d 65, 87 (Kan. 1997)) (listing factors to consider for reasonableness).

[124] *See Alton M. Johnson Co. v. M.A.I. Co.,* 463 N.W.2d 277, 279 (Minn. 1990) (holding that an insurer was not entitled to a jury trial on the issue of reasonableness of the settlement because of the complexity of the issue). Other courts have recognized that because of the complexity of the issue and the potential requirement for a trial within a trial, the matter should normally be decided by the court.

[125] *See Midwestern,* 119 F.Supp.2d at 845-46 (declining to take the issue of reasonableness away from the jury where it is genuinely disputed but recognizing that demonstrating unreasonableness is a high burden to meet for an insurer that has breached its duty to defend its insured).

against Transit were reasonable and prudent under the circumstances of the case.[126] In meeting their burden, the Settling Parties identify record evidence of more than $2.8 million in boardable damages for the thirty plaintiffs. Record evidence also supports that without PIIC as a surety, Transit would have insufficient means to pay the likely judgments. In addition, the Settling Parties identify significant evidence warranting a large general damages award. Some of the plaintiffs suffered severe spinal injuries and multiple fractures. One suffered a traumatic brain injury. Others continue to suffer from on-going PTSD and post-concussive symptoms. Potential punitive damages also loomed large in the background when the Settling Parties resolved the case.

The Settling Parties also meet their initial burden on summary judgment regarding how Transit's liability risk impacted the appropriate settlement amount. All defendants (except, perhaps, Mr. Dowd) had full notice that the trailer began to fishtail when driven faster than thirty miles per hour. Neither Transit, as Mr. Dowd's employer, nor any other defendant adequately trained Mr. Dowd regarding that risk. Furthermore, the accident reconstruction report summarizes multiple factors, all the fault of Transit, that contributed to the accident. Namely, the report's author opines that negligent maintenance of the trailer, unsafe driving practices, and the absence of any safety restraints contributed to the accident and the injuries sustained by the passengers. To balance against Transit's liability, the record is devoid of evidence regarding any comparative negligence by the injured plaintiffs. The injured plaintiffs sat passively as passengers on the trailer. There is absolutely no evidence that they somehow contributed to the accident.

---

[126] Although the Gigler plaintiff and PIIC have recently resolved her claim, the Court nevertheless must evaluate the reasonableness and circumstances surrounding the settlement based upon the claims existing at the time all Settling Parties entered their Agreements.

When shifting to the second question regarding fraud, collusion, or bad faith, the Settling Parties likewise meet their initial burden on summary judgment. The circumstances surrounding the settlement demonstrate that the defendants, including most germanely Transit, were aware of the excess liability that they could face if they proceeded to trial. When PIIC withdrew its defense of Transit, Transit reasonably and prudently engaged in substantial and thorough discussions regarding a settlement. At that point, Transit faced the prospect of defending itself in a large and complex trial. The Settling Parties convincingly demonstrate, on this record, that they approached the settlement in good faith. All defendants reasonably recognized that resolving the case in such a manner was in their best interest. Finally, the record supports an arms-length negotiation between Transit and the injured parties, as would be expected after a year of litigation over the value of the claims.

In opposing summary judgment, PIIC identifies no genuine issue of material fact regarding the appropriateness of the damages amount. When presented with the Settling Parties' evidence, PIIC does not challenge the plaintiffs' evidence of more than $2.8 million dollars in boardable damages. Nor does PIIC step forward with evidence contesting the severity and permanent nature of many of the thirty plaintiffs' injuries. Finally, it offers *no* evidence to support that Transit's conduct was anything other than negligent *and* reckless.

PIIC proffers one piece of evidence to support a jury issue as to the reasonableness of the settlement amount. Namely, it relies upon a July 15, 2020, email from Transit and Limo's personal counsel to the Bogel plaintiffs' attorney. In summary judgment analysis, only likely admissible evidence at trial may be relied upon when demonstrating an issue of fact.[127] Here, this contact, made between

---

[127] *See Rochester v. Katalan*, 320 A.2d 704, 708 (Del. 1974) (recognizing "[i]t is fundamental that a motion for summary judgment must be decided on the record presented and not on evidence

adverse parties in settlement negotiations, falls within the purview of Delaware Rule of Evidence 408.[128] Namely, the email qualifies as a statement made during compromise negotiations and would be inadmissible at trial. Moreover, the statement would more reasonably be relied upon by the Settling Parties if it were admissible. Namely, such give and take between plaintiffs' counsel and defense counsel demonstrates anything but improper collusion. It demonstrates arms-length negotiations.[129]

PIIC likewise identifies no genuine issues of *material* fact as to fraud, collusion, or bad faith. The Court acknowledges that Limo had scant-enough liability exposure to create a potential factual issue regarding why Limo consented to the judgments. PIIC focuses on this lack of evidence of liability as evidence that makes summary judgment inappropriate. That question and other questions regarding the other defendants' motivations become immaterial. Only the issue of Transit's motivation is material in this case. The judgments consented to by Limo were inconsequential because (1) the MCS-90B covered Transit, and (2) the consent judgments imposed joint and several liability upon Transit to satisfy the entirety of the judgments.

---

potentially possible"); *Kennedy v. Giannone*, 527 A.2d 732 (Del. 1987) (TABLE) (holding that a party must come forward with admissible evidence to show the existence of a genuine issue of material fact).

[128] *See* D.R.E. 408 (providing that "[e]vidence of the following is not admissible on behalf of any party either to prove or disprove the validity or amount of a disputed claim . . . (2) [c]onduct or a statement made during compromise negotiations about the claim").

[129] *See* PIIC Ans. Br., Ex. 14 (email) (explaining, by Steve Markey as counsel for plaintiffs, that a verdict may be much higher than $6 million, to which Jeffrey Young countered, as counsel for defendants, that the verdict would likely be within $1 million); *see also* PIIC Ans. Br., Ex. 44 (Dep. of Jeffrey Young, Esq.) at 36:2-14, 37:8-20 (acknowledging the email, during settlement discussions, and stating ". . . there's nothing inconsistent about a defense lawyer saying to a plaintiff's lawyer 'your claim [sic] worth what you think it is'. . ."); Pl. Mot. Summ. J., Ex. 2 (Dep. of Stephen Markey III, Esq.) at 52-57:12 (discussing, for the purpose of settlement negotiations, that after conducting a focus group, he believed "a verdict . . . of $25 million," was possible).

Here, Transit contracted to haul the passengers, it leased the vehicles involved in the accident, and it provided the driver to drive them. PIIC identifies no genuine issue of *material* fact as to Transit's fraud, collusion, or bad faith when either Transit or the Hastings for that matter, who were Transit's principals, consented to the judgments against *Transit*. No reasonable jury could find on these facts that Transit agreed to an unreasonable settlement amount or that its principals failed to act in good faith when they included *Transit* in the Agreements.[130] By the time Transit settled, PIIC had turned completely away from the litigation notwithstanding the above-described suretyship obligation that it owed to Transit. Given these circumstances, Transit was not required to engage in financial masochism. It was free to enter this reasonable settlement to protect its own interests.

In conclusion, Transit is a covered entity pursuant to the MCS-90B. Because Transit is jointly and severally liable for the $6.1 million in consent judgments, the question of whether Limo and the other defendants should have been included in an allegedly collusive settlement as to Limo is not material. PIIC needs to pay no more than $5 million, one time, toward a single joint and several qualifying judgment.

---

[130] PIIC cites the United States Court of Appeals for the Tenth Circuit decision in *Continental Casualty v. Hempel,* 4 Fed. Appx. 703 (10th Cir. 2001) for the premise that a genuine issue of material fact remains in this case. The *Hempel* decision, which actually affirmed summary judgment on behalf of the non-participating insurer, is easily distinguishable. Namely, the parties consented to a judgment of $26.38 million after the plaintiff and defendant demonstrably maximized the amount awarded in a trial where the plaintiff and defendant worked in tandem. *Id.* at 718. The trial court, and the appellate court, first recognized that the amount of that settlement was "wildly out of proportion." *Id.* Furthermore, the court examined several substantial defenses that the parties did not present, including a winning statute of limitations defense. *Id.* Finally, pursuant to the examined agreement, one of the defendants retained a ten percent interest in the judgment. *Id.* at 719. It would be difficult to contemplate a more collusive and unfair consent judgment than the one examined in *Hempel*. In the absence of PIIC identifying *any* such evidence that supports unreasonableness or collusiveness in this case, summary judgment against PIIC is appropriate.

45

**D. There is no genuine issue of material fact regarding PIIC's tortious interference with contract claim or its fraud claim; nor is PIIC's claim that the Hastings defendants are liable to it based upon alter ego liability cognizable in Superior Court.**

As a final matter, summary judgment must likewise be entered against PIIC on its tortious interference with contract claim. Under Delaware law, the elements for this claim are: (1) a contract, (2) about which the defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury.[131]

Regarding this claim, PIIC contends that the actions of defendants other than Transit caused it to breach its contract with Limo. PIIC fails to identify material issues of fact relevant to multiple elements of this claim. The Court will address only one: harm. Namely, PIIC identifies no evidence supporting the fact that it suffered an injury because PIIC retains no obligation to Limo after it separately pays the $5 million on behalf of Transit. It need only pay up to $5 million one time. For that reason, any alleged breach by Limo in refusing to permit PIIC to direct its attorney to file a summary judgment motion on behalf of Limo could have caused PIIC no harm as a matter of law. The lack of any such harm also precludes PIIC's fraud claim.

Finally, the Court cannot consider PIIC's remaining claim in Count I of its amended petition: alter ego liability. Under Delaware law, claims to pierce the corporate veil lie only in the Court of Chancery.[132] The Court provides no opinion regarding the merits of that claim other than to recognize that no such claim lies in Superior Court. Given this Court's lack of jurisdiction over the issue and PIIC's

---

[131] *Bhole, Inc. v. Shore Investments*, 67 A.3d 444, 453 (Del. 2013).

[132] *Sonne v. Sacks*, 314 A.2d 194, 197 (Del. 1973). *See Yu v. GSM Nation, LLC*, 2017 WL 2889515, at *3 (Del. Ch. July 7, 2017) (acknowledging that an alter ego liability or piercing the corporate veil claim is an equitable and may only be brought in the Court of Chancery).

46

right to attempt recoupment from Transit, the removal procedure provided in 10 *Del. C.* §1902 will apply to that count. The Court will sever Count I from PIIC's petition through an accompanying order and will grant summary judgment addressing all remaining claims. As provided in § 1902, Count I will not be dismissed before sixty days from the date from which the order denying jurisdiction over that count becomes final.[133]

## V.    CONCLUSION

For the reasons discussed above, the Court severs Count I from PIIC's amended petition in intervention. That count will remain subject to potential removal to the Court of Chancery. As to all other claims in PIIC's amended petition, the parties' cross-motions are **Granted, in part**, and **Denied, in part.** PIIC need not indemnify Transit or Limo pursuant to the Elite Endorsement's coverage extension. Pursuant to the MCS-90B, however, PIIC, must satisfy the judgment entered against Transit in favor of the Bogel plaintiffs after a credit for NICO's $824,000 payment toward that judgment.

---

[133] *See* 10 *Del. C.* § 1902 (providing the process, and the sixty-day deadline, for removal to the Court of Chancery).